Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

| | | |
|---|---|---|
| FINJAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 18-02621-WHO** |
| | ) | |
| CHECK POINT SOFTWARE | ) | |
| TECHNOLOGIES, INC. and CHECK | ) | |
| POINT SOFTWARE TECHNOLOGIES, | ) | |
| LTD., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, July 10, 2019

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff:

        KRAMER, LEVIN, NAFTALIS & FRANKEL LLP
        990 Marsh Road
        Menlo Park, California  94025
    BY: **LISA KOBIALKA, ATTORNEY AT LAW**
        **KRISTOPHER KASTENS, ATTORNEY AT LAW**
        **LINJUN XU, ATTORNEY AT LAW**

For Defendants:

        ORRICK, HERRINGTON & SUTCLIFFE LLP
        777 South Figueroa Street - Suite 3200
        Los Angeles, California  90017
    BY: **ALYSSA M. CARIDIS, ATTORNEY AT LAW**
        **CLEMENT S. ROBERTS, ATTORNEY AT LAW**
        **EVAN D. BREWER, ATTORNEY AT LAW**

Reported By:      Marla F. Knox, RPR, CRR
              Official Reporter

<u>**Wednesday - July 10, 2019**</u>                                  <u>**9:14 a.m.**</u>

P R O C E E D I N G S

---oOo---

**THE CLERK:**  Calling civil matter 18-2621, Finjan,
Incorporated versus Checkpoint Software Technologies,
Incorporated, et al.

Counsel, please come forward and state your appearance.

**MS. KOBIALKA:**  Good morning, Your Honor, Lisa Kobialka
on behalf of Finjan and I'm accompanied by Kris Kastens, my
partner, and Ms. Xu.

**THE COURT:**  Good morning.

**MR. ROBERTS:**  Good morning, Your Honor, Clement
Roberts on behalf of Checkpoint with Alyssa Caridis and Evan
Brewer.

**THE COURT:**  All right.  Good morning.  Let me give you
my thoughts on these motions.

With respect to the motion to strike amended infringement
contentions, I'm inclined to grant regarding the Blade
Architecture which allegedly infringes the '968.  I think
the -- it is necessary -- I asked before, and I really would
like to see a chart for each blade to clarify which blades
Finjan is accusing to specify the combinations when they exist
and how they infringe.  So I'm going to give you the
opportunity to amend one more time and just be -- just make
this clear.  This is the whole point of this exercise.  So make

1   it clear.

2        I'm inclined to grant regarding -- with respect to the

3   '844, the instrumentalities other than the Endpoint Threat

4   Emulation, which is the only one that is mentioned in the chart

5   on that patent.

6        I would also grant regarding ThreatCloud because it is a

7   marketing term and not a product, and there is no argument on

8   that in the opposition.  So I'm inclined to do that with

9   prejudice unless there is some reason not to do that.

10        With respect to the source code, I'm inclined also to

11   grant Check Point -- it's a -- source code is not easy for me

12   to understand and -- but Check Point says in its brief that

13   there was no code cited for 30 of the 52 accused

14   instrumentalities, and there wasn't a response to that in the

15   briefing that I saw.  So if that's true, then I would grant

16   that with prejudice and only allow the contentions that are

17   listed in Check Point's Appendix 2 to continue.

18        With respect to the motion regarding the doctrine of

19   equivalence, I deny that.  I think that's -- that is

20   sufficiently asserted.  And I would also point out that Check

21   Point didn't object to the DOE the first time around.

22        With respect to the new instrumentalities that were not --

23   the alleged new instrumentalities that weren't initially

24   charted, I would grant with respect to that, that products not

25   in the initial contentions would be struck.  And you would need

1   good cause in order to assert them again and not just throw

2   them into the case.  And that includes all the products that

3   weren't mentioned and the so-called undefined functionalities

4   and marketing terms in Appendix 3.

5       With respect to the -- the motion to strike the Xu

6   declaration, that would be granted because she obviously did

7   not have personal knowledge sufficient to write that

8   declaration.  It is my assumption -- and I just want Ms. Xu to

9   clarify this for me -- that she did not look at the source code

10  outside of the repository.  My assumption is what happened was

11  that she got information from the expert and put that in as the

12  large part of the basis of that declaration.  That's

13  inappropriate.  I'm not going to make a bigger deal of it than

14  that, but don't do that again.  And -- but I just want to be

15  sure that that's the case.  Because if it's not, then we have a

16  different issue.

17      And then, finally, Checkpoint's motion to amend the

18  invalidity contentions wasn't opposed, so that's granted.

19      So who wants to take that on or do you just want to accept

20  the tentative?

21      **MR. KASTENS:**  Your Honor, Kristopher Kastens for

22  Finjan, Inc.

23      I'm just going to address the blades issue and

24  instrumentality that they keep raising.  So I just want to

25  clarify something, Finjan's infringement contentions are in

1    line exactly with what we understood your order to be and the

2    Federal Circuit law.  So Federal Circuit law says -- and

3    that's -- I'm citing a case in our brief, the *Vasudevan*

4    *Software, Inc.* -- that if you have a software package with

5    different functionality included in it and something can be

6    turned off and something can be turned on, doesn't matter so

7    long as it is included within the actual functionality.  That's

8    why we originally grouped it as a single application.  It is a

9    single application in our view.  You receive it.  You can turn

10   on and off functionality and use certain functionality.

11        Now what we have done -- we are not accusing every single

12   functionality within this software application.  Within our

13   charts what we have done is divided up -- we have gone through

14   and for each element, we have divided it into separate

15   contentions related to specific technologies.  Sometimes these

16   relate specifically to blades because sometimes they map

17   cleanly to blades.  There is a whole bunch of stuff within the

18   functionality of the software package.  They don't say it is

19   attributable to any product.  They just say it is other code in

20   there.  It is in this overall software application.  They don't

21   say it is attributable to any actual blade.  That's what we

22   submitted to you actually on Monday in supplemental briefing

23   which was their mapping of the -- of these products, these

24   blades, that they are calling them, which are actual

25   functionalities to the actual source code.  It just shows you

1    it took 700 pages to map that out.  It just shows you they are

2    parsing out one software application into multiple different

3    functionalities.

4         So mindful of your previous order to make this as clear as

5    possible, we have gone through; and we have specifically

6    identified functionality for each element.  So what they say we

7    didn't cite source code for 30 of the 52 instrumentalities,

8    that is because they -- that's related to functionality in that

9    software application that is not part of our infringement

10   contentions.  They are just calling those separate products

11   even though they are included within the one software

12   application.

13        If you have one software application and you and it has

14   three different functionalities, just because one of those

15   functionality is not accused, doesn't mean that functionality

16   is not within the product.  I think that is the fundamental

17   dispute.  That's all we are saying is that what we would like

18   to accuse is the actual application they distribute.

19        We have identified within that application the specific

20   functionality.  I believe that was perfectly in line with what

21   your order requested.  We grouped all the technology together

22   and did that.  When they say 30 out of 52, that's what they are

23   talking about.

24        I also wanted to relate to this -- to the new products

25   that they are saying.  Again, what they are saying is -- we

1   just said we are accusing this software application.  And they

2   are saying, Oh, that software application has functionalities

3   that you didn't previously name in your infringement

4   contentions.  We never denied that.  Those functionalities were

5   not the basis of our infringement.  We are still accusing that

6   software application.  So that is really cutting to the quick

7   of it.

8        Regarding the undefined functionalities and terms, they

9   admit those aren't products.  We are just -- they asked for

10  more specific information about how they infringe.  So we went

11  through -- and we found technical information -- describing how

12  they actually infringe with these -- with using documents

13  describing -- in their source code describing how their

14  technology actually works, and they don't even deny that these

15  aren't products.

16       So, I mean, we are trying to do our best to give them the

17  most complete infringement contentions as possible.  Any time

18  that we give them more details -- they ask for more details.

19  We give them more details.  And they say that is an undefined

20  functionality.  You can't bring that in.  They don't even say

21  their products.

22       I think I would strenuously argue that should not be

23  subject to anything within the motion to strike.  First of all,

24  they don't even deny that these aren't products even under

25  their definition of products which we again strenuously object

1    to because all the support says it is a single software

2    application.  So that's how we addressed it within our

3    contentions and then within there -- to make sure that we were

4    perfectly clear -- we divided out the specific technologies,

5    some which directly map to blades and others which don't.

6         Regarding the ThreatCloud, I don't know -- my

7    understanding is that we may have addressed it.  I know we

8    addressed it in previous briefing.  I mean, I don't understand

9    why they would say it is a marketing term.  They have data

10   sheets on it to say it is a product.  We have looked at source

11   code and cited source code for the product.  How can you say it

12   is a marketing term when we have cited source code for it?  I

13   don't think they deny we cited source code.  What are we

14   pointing to if it is not a product?  I have a real hard time

15   grappling with the whole rationale where they can just say

16   anything we point to is a marketing term; therefore, strike it

17   when we are pointing to source code.

18        We have been as explicit as possible throughout this

19   process that our contentions are limited to what we have within

20   our charts.  So if we really cited nothing but a marketing term

21   and -- which in our charts -- be that as it may -- that would

22   be difficult, but we have cited source code for an actual,

23   real-life product.  So, I mean, I think that's what we would

24   just say.  Like, no, we actually have a --

25            THE COURT:  So I guess, Mr. Kastens, one of the things

1   I'm wondering is whether you are telling me that you have

2   really done all you possibly can and what you have provided is

3   it as far as you are concerned; that you couldn't do what I

4   suggested, for example, with the Blade Architecture and do it

5   blade by blade and lay things out; that you couldn't respond

6   specifically to the -- what you think Check Point already knows

7   and is sort of playing games with you a little bit and just

8   say, no, we are not going after this, this, this and this.  Be

9   absolutely explicit and answer all those -- don't you think you

10  could do that?

11          MR. KASTENS:  Your Honor, I think as far as -- we

12  viewed their request that we were to -- that the grouping of

13  these products as a pure formality.  We argued -- we met and

14  conferred with them.  We go, Look, if you are saying these

15  should be in separate charts for each blade, we will do it.  We

16  can do that easily.  We offered that three separate times to

17  them, and they never responded to that.

18      So that is not to say that we can't divide up the charts.

19  It just made a whole lot of sense -- since it is actually one

20  software package, it makes a whole heck of a lot more sense to

21  put it in one chart.  It is a matter of form over substance.

22          Furthermore, given that they finally -- after requiring a

23  motion to compel, a response -- have told us what source --

24  what they say what source code goes with what products took 700

25  pages by the way -- we finally have their position on what they

1   say what source code goes with what products.  That may be a

2   basis also to further provide information.

3       I mean, we have -- I think you may remember the last time

4   we were in front of you, that we felt that would be information

5   that would be easy to provide.  We asked interrogatory on it.

6   That was supposed to be answered before we supplemented our

7   infringement contentions.  They refused to answer it.  Then we

8   required a motion to compel.  Then they extended their time to

9   respond.  So we only got it last week, and we submitted it to

10  you.  And I think if you take a look at that, you will see they

11  will cite four directories for what they say is -- of source

12  code for what they say is a product; and then immediately after

13  that, they will cite literally, five, six pages of directories

14  and say this is just other code relied on by this product; but

15  it is not part of the product itself.

16          **THE COURT:**  All right.

17          **MR. KASTENS:**  So -- yeah, so, you know, I think that

18  once again goes back to -- I mean, a bit of the games that they

19  are playing.  As far as dividing up charts and it being

20  absolutely specific to what blade we -- we are talking about at

21  a specific point, we can do that and we have offered to do

22  that.

23          **THE COURT:**  It's -- you have experience with me.  I'm

24  like a second grader when it comes to this.  It has to be

25  really clear to me that what you are doing is clear to

 1   everybody else, and I'm -- I take the bar low.

 2           **MR. KASTENS:**  Your Honor --

 3           **THE COURT:**  So that's what I'm looking for.  Let me

 4   hear from Mr. Roberts.

 5           **MR. ROBERTS:**  Yes.  So to start with the last point,

 6   their offer to divide them up into separate charts was said We

 7   will take the exact same information and put that into separate

 8   charts if that will resolve the issue.  There are lots of

 9   issues that we brought to the Court's attention.  We were not

10   able to accept that compromise.  I will also note that the

11   Court ordered them to do that.  The offer that, Hey, if we do

12   this one thing that the Court ordered us to do and we didn't

13   follow the Court's order on that rules out the entire issue was

14   not a particularly appealing offer.

15       I do want to correct the Court with respect to

16   ThreatCloud.  I think what the Court said when they cite our

17   characterization -- in particular, they have cited code for

18   Threat Emulation, which is a product within the ThreatCloud

19   marketing term.  So we are not asking that their allegation as

20   to Threat Emulation be struck; merely, the other products

21   within the ThreatCloud marketing term.

22           **THE COURT:**  I meant to say that if I didn't say that.

23           **MR. ROBERTS:**  No worries.  I just wanted to respond to

24   what Counsel said we cited code for that product.  The product

25   for which they cited code within the ThreatCloud marketing term

1   is Threat Emulation.

2        Your Honor, we put in as Appendix 1 -- and I have a

3   slightly easier one here if the Court wants to see it -- a

4   chart that shows for which claims and which products they cited

5   code and which ones they did not.  So we went through and we

6   cited it.  If these are just marketing terms, why have we --

7   you know, we cited code for them.

8        The issue with the marketing terms is generally they

9   haven't cited code for them.  The other undefined

10  technologies -- the problem is they say:  This technology or

11  that technology is not linked to an infringement contention.

12  It is not linked to a code citation.  It is just a reference to

13  a technology without a code citation.  It is to a specific

14  product.

15       It is not like there are code citations to free-floating

16  technologies.  There are references to vague technologies and

17  citations to products.  Never the twain shall meet.

18       When he said, Well, there are a whole lot of code sources

19  available that are not part of the product, that's true.  For

20  example, there is an underlying operating system.  And what

21  their interrogatory asked for was they said:  Tell us all of

22  the code that is part of or used by a product.  And the way we

23  interpreted that was we will give you the unique code that is

24  in each product, and then we will tell you everything else that

25  interacts with it because although these are individual

 1   programs, discreet programs, they have a lot of interactions.

 2   None of that code that does the interactions have they cited

 3   anywhere in their infringement contentions.  None of it.  It is

 4   not anywhere.  There is no allegation that sort of operating

 5   system level code shared by all the products constitutes an

 6   infringing instrumentality.  There is no allegation about that

 7   anywhere in there.  There wasn't in the first one, and there

 8   isn't in this one.

 9        I think I have addressed the important points.  If the

10   Court has additional questions, I'm happy to answer them.

11        **THE COURT:**  I don't.  Mr. Kastens, do you have any

12   response?

13        **MR. KASTENS:**  Your Honor, you should have a copy of

14   the source code exhibits.  If you want to take a look at it, I

15   think it will show you that it looks like there has been

16   efforts made to like -- like, not represent in a manner that we

17   can technically make sense of what this application is.  It is

18   a single application.  We have accused it.  That's what we are

19   accusing.  That is what our contention is.  I don't think there

20   is a factual record to say at this point in the contention

21   stage to deny that that's true.  To the extent that they have

22   these certain definitions of what products are is completely

23   based on what they argue their products are using a super

24   narrow definition of what the code is for those products.

25        So what I would seek leave to do, Your Honor, is if you

believe that a -- the charts by blade are the proper way, that

we be allowed to go ahead and chart them using the blades.  It

would just really just take a matter of just dividing up our

charts.  We already have the charts divided up by blade.  To

understand that, the actual underlying code, for example, on

some of these don't directly -- and some of the technologies

don't directly map to a particular -- they say they are part of

no products.  I don't even know what to do in that instance if

you say something is part of no product even though it's an

application that is construed to the customers, and they only

say 5 percent of the code actually in that application is in

any sort of product.  It is just -- it does not make sense and

defies belief on that -- so that's what they seem to be

attempting to do.

So I think we can -- based on what our previous

contentions are, we can divide them and specifically identify

the blades.  And all the blades that we have identified within

our contentions regarding the actual functionality at issue

were identified in the letter -- were identified to them as

infringing products or was specifically related to source code

that was previously cited even if they weren't specifically

called out as that particular blade at that time.  We cited

source code for the blade.  We can much more easily do it now

that they have actually finally responded and said what source

code goes with what blade.

1          **MR. ROBERTS:**  To respond to that last point, we have

2     been into this case now for almost a year.  They have had the

3     source code almost that entire time, over ten months,

4     I believe, at this point.  They asked us to do this mapping of

5     not just what code is in each blade but also all of the code

6     that we produced that interacts with it.

7          We responded under 33(d) that it was a mechanical process;

8     that someone would have to go through all the code and look at

9     all of the links and look at all the functions and list them

10     out.  They said it was easier for us to do it than for them.

11          When I met and conferred with Mr. Andre, I said, Look --

12     before that motion, I said, Look, if you are telling me your

13     experts don't have the ability to do this -- like they can't do

14     it -- I will do it for you.  They said, No, they can do it.  We

15     just think it is easier for you.  We litigated a motion over

16     that.  The magistrate judge said we had to do it.  We did it.

17     I don't understand what they say:  Oh, now that we have this

18     thing, we can do something different.  They have had three

19     different experts look at this code for over ten months.

20          **THE COURT:**  I'm allowing them to amend.

21          **MR. ROBERTS:**  Yep.

22          **THE COURT:**  This is going to be the last time.  So do

23     the absolute best, and then you are going to be stuck with it.

24          **MR. KASTENS:**  Yes, Your Honor.

25          **THE COURT:**  And I will get an order out on these

```
 1   things, and we will see where we are.

 2           MR. KASTENS:  May I raise two additional brief issues

 3   not related to the merits of that?

 4           THE COURT:  Okay.

 5           MR. KASTENS:  One is the scheduling order with respect

 6   to claim construction.  If they are going to be amending, can

 7   we, again, delay the claim construction until we --

 8           THE COURT:  Yes, we have to do that one more time; and

 9   then that will be it.  I mean, the whole -- this is something

10   that occurs not in just this case but the whole purpose of this

11   is not to have preliminary jousting, but it is to understand

12   what the case is; and it is for you to understand it so that

13   you can explain it to me when it comes time for claim

14   construction and everything else.  And what I often see through

15   the clouds is just sort of general obfuscation.  So I really

16   want you to -- this should be a matter at this point of

17   collaboration and understanding -- and making sure that you

18   both understand what your perspectives are, so you can then

19   present it to me.

20       I do think we have to delay it one more time, and we can

21   set the schedule either by your stipulation which would be

22   preferable.  And if you can't do that, give me competing

23   schedules.

24           MR. ROBERTS:  Your Honor, I just -- one last point

25   based on that, you know, we believe from their motion that they
```

1  filed to amend their invalidity contentions, if you read that,

2  they have full understanding of what our contentions are.

3       **THE COURT:**  I know that is your perspective, and you

4  may well be right.  I don't know.  I can't read into either of

5  your minds.  You both think that the other one is acting in a

6  nefarious way, and that is the way that you litigate; and

7  that's too bad for me, and it is probably too bad for your

8  clients.

9       **MR. ROBERTS:**  My further point to that was just -- I

10  think if you take a look at our actual charts we provided, we

11  went through great pains to make them as understandable as

12  possible.  We have underlined, highlighted, arrows, everything

13  we can do to try to say:  This is what we are accusing.  And

14  this just seems to be monkey business to keep trying to, you

15  know, argue about what the definitions are --

16       **THE COURT:**  We finished with that motion, so I don't

17  want to deal with that anymore.

18       **MR. ROBERTS:**  All right.

19       **THE COURT:**  Ms. Xu.

20       **MS. KOBIALKA:**  Your Honor, I will want to be heard on

21  your ruling as well.  I have to make some statements, but it is

22  fine to go ahead.

23       **MS. XU:**  Good morning, Your Honor.

24       **THE COURT:**  Was I correct in my understanding of how

25  the -- your declaration was laid out?

1          **MS. XU:**  Respectfully, it is incorrect.  What happened

2     is I did a in-person source code review sometime in September

3     of last year, and at the time the majority of the source code

4     was already on the source code computer.  So specifically there

5     is a network security blade -- so-called Blade Architecture,

6     and that one contributes to the majority of the source code on

7     the source code computer.  That particular source code was

8     already there at the time of review.

9          Similarly, there is endpoint security source code which

10    was also there at the time when I did the review; and if you

11    look at my declaration, it contributed to the majority of the

12    source code.

13         **THE COURT:**  Are you saying -- what I understood the

14    facts to be was that you were in the repository for two and a

15    half hours or something like that?

16         **MS. XU:**  Yes, that portion is correct.  I was there,

17    and then I looked at what is being loaded onto the source code

18    computer as well as how many files were there and those sort of

19    ballpark estimate, also in my declaration, and I also opened

20    selected files to take a look to see the functionality of

21    certain files and folders.

22         **THE COURT:**  Are you telling me that the entire

23    declaration was from your own personal knowledge?

24         **MS. XU:**  That's a trick question.  So --

25         **THE COURT:**  No, it's not.

1          **MS. XU:**  Okay.  I'm saying that declaration is based

2     on my review of the source code on the source code computer,

3     but it is also based on subsequent reviews by our expert and

4     then the expert had --

5          **THE COURT:**  So here is the point -- and this is the

6     only point that I wanted to make, and I wanted to be really

7     clear -- you don't get to put in a declaration that you say you

8     have personal knowledge of information that you don't have

9     personal knowledge of.

10         So when you are putting in the -- what an expert has told

11    you about the source code review, you need to have that expert

12    do it, not you.  And don't let any partner in your law firm

13    tell you that you need to do this yourself.  That's -- you are

14    stuck always with your -- the most important thing you have is

15    your integrity, and you don't use somebody else's testimony and

16    put it in as your own.  Don't let anybody do that.  So this is

17    not -- I'm -- that was the basis for my ruling, okay.

18         **MS. XU:**  Okay.

19         **THE COURT:**  Thank you.

20         **MS. KOBIALKA:**  Your Honor, may I be heard briefly on

21    your ruling?  I do think that there have been some other

22    allegations that have been made in connection with that

23    particular motion that I have concerns about as well as the

24    relief that is requested and so --

25         **THE COURT:**  So all I'm doing is saying -- I don't

 1   think this is -- I don't think this is a big issue in the -- on

 2   any level except for I think it was inappropriate for you to

 3   make Ms. Xu file that declaration.  I don't blame her at all.

 4   But I do blame your firm.  And you just shouldn't do it that

 5   way.

 6         **MS. KOBIALKA:**  I understand what your ruling is.  I

 7   wanted to get clarification because they have asked for

 8   in-camera reviews and --

 9         **THE COURT:**  I'm not doing anything -- I'm done with

10   that, and Ms. Xu has indicated that she didn't violate the

11   protective order.  What she did was -- and it happens.  Other

12   people do similar kinds of things, but it is not right; and I

13   shouldn't have people do it.

14      If you want to have somebody make a statement about what

15   anything says, make sure they have personal knowledge.

16         **MS. KOBIALKA:**  I mean, that takes me to the other

17   point, which was that we signed declarations that says there

18   has been 200 hours of document review in connection with, let's

19   say, some discovery dispute.  Now, I didn't personally do that

20   document review; but I may have overseen that entire process.

21      And to be very clear, her declaration is just about

22   high-level information regarding the source code.  You know,

23   90 percent of it was based on what she had actually seen

24   already.  And she referred, especially in her declaration, that

25   there was a hundred hours of review total done.  She never

1    said, I personally did that review.

2        So I understand your ruling, but I want to be clear

3    because what it sounds like you are saying now is if I have a

4    motion to compel, I'm now going to have -- let's say, the five

5    associates who did the document review say, I did 25 hours of

6    this review.  I did this other review -- if I'm overseeing that

7    process, I think it is fair to say I oversaw this review, and

8    it took a total of 125 hours or 125 paralegal hours.  This

9    really is the level at which the declaration was stated.

10       **THE COURT:**  That's not the way that I read it, and

11   that is not the way I just heard it described.  And I wouldn't

12   be argued this so vociferously because I think I'm being fairly

13   lenient with respect to all of this because I do accept the

14   truth of what Ms. Xu just said.

15       **MS. KOBIALKA:**  The only other question I have in

16   connection with this is we were required to do pinpoint

17   citations; and, you know, they made a big stink about maybe you

18   have copied the source code, and I understand you haven't ruled

19   on that.  But in order for us to do pinpoint citations, we have

20   to identify directory paths and things like that; and we are

21   not calling that source code, right.  That is not actual source

22   code.  That is just a path name because it is what we had to

23   put in the infringement contentions.  So I just wanted to make

24   that clear and wanted to make sure there wasn't any dispute

25   about that because of all the allegations that have come up.

1              THE COURT:  Mr. Roberts.

2              MR. ROBERTS:  I don't know what is in the expert's

3     notes.  If it is only what is cited in the infringement

4     contentions, I'm not going to have issues with it.  If there

5     are additional pages of source code that she said she reviewed,

6     then I would have issues with it because that would go outside

7     the bounds of the protective order.

8              THE COURT:  I'm satisfied with where we are.  Is there

9     anything further?

10             MR. ROBERTS:  No, Your Honor.

11             MS. KOBIALKA:  Nothing, Your Honor.

12             THE COURT:  Thank you.

13                  (Proceedings adjourned at 9:45 a.m.)

14                          ---oOo---

15

16                  **CERTIFICATE OF REPORTER**

17         I certify that the foregoing is a correct transcript

18    from the record of proceedings in the above-entitled matter.

19

20    DATE:   Thursday, July 25, 2019

21

22

23

24    _____

25              Marla F. Knox, RPR, CRR
                   U.S. Court Reporter