UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FINJAN, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>CHECK POINT SOFTWARE TECHNOLOGIES, INC., et al.,<br><br>    Defendants. | Case No. 18-cv-02621-WHO<br><br>**ORDER GRANTING MOTION TO STRIKE INFRINGEMENT CONTENTIONS IN PART; GRANTING MOTION TO STRIKE ATTORNEY DECLARATION; GRANTING MOTION TO AMEND INVALIDITY CONTENTIONS; GRANTING MOTIONS TO SEAL**<br><br>Re: Dkt. Nos. 125, 126, 129, 130, 131, 137, 138, 139, 141, 163, 166, 172, 177, 178 |

    Defendants Check Point Software Technologies, Inc. and Check Point Software Technologies Ltd. (collectively "Check Point") move to strike Plaintiff Finjan, Inc.'s ("Finjan") infringement contentions for the second time. I previously granted Check Point's motion to strike Finjan's infringement contentions in part and gave Finjan leave to amend its contentions to comply with my Order Re Case Narrowing and Infringement Contentions (the "Narrowing Order") [Dkt. No. 29] and the Patent Local Rules. Order Granting Motion to Strike in Part; Granting Motions to Seal; Granting Motion to Amend Claim Construction Schedule (the "IC Order") [Dkt No. 84]. Although Finjan's amended infringement contentions ("AICs") are more complete, I agree with Check Point that they are still deficient and violate the IC Order, Narrowing Order, and the Patent Local Rules. I will grant Check Point's motion to strike the AICs.

    Check Point also filed two other motions that I will grant. First, I will strike the declaration of Finjan's attorney, Linjun Xu, attached to Finjan's opposition to the previous motion to strike, because much of it was made without personal knowledge. Second, I will allow Check

Point to amend its invalidity contentions because its motion was unopposed.

## BACKGROUND

In September 2018, I received briefing from the parties on how to manage this litigation in compliance with Federal Rule of Civil Procedure 1's mandate of a "just, speedy, and inexpensive determination of this action[.]" Narrowing Order. I then ordered Finjan to serve its infringement contentions under specifications that largely follow the provisions of this District's Patent Local Rules as well as the guidance provided in the since withdrawn 2013 Model Order from the Federal Circuit. Narrowing Order. Finjan was instructed to "include pinpoint source code citations . . . accompanied by the document production required by Patent Local Rule 3-2" and to also:

> (i) avoid open-ended citations to "exemplary" products and use of the terms "such as" and "for example"; (ii) set forth any infringement theories based on the doctrine of equivalents with limitation-by-limitation analyses; and (iii) for any indirect theories of infringement, identify the alleged direct infringement, the alleged acts of inducement or contribution to that infringement, and the relationship between them.

*Id.* at 2.

On November 2, 2018, Finjan served its infringement contentions on Check Point, which then moved to strike the infringement contentions, arguing that they violated my Narrowing Order and the Patent Local Rules. Check Point's Motion to Enforce Court Order and Strike Infringement Contentions at 1-3, 15-24 [Dkt. No. 55]. I largely agreed that Finjan's infringement contentions failed to comply in the IC Order, and made several rulings that I summarize below.

First, I required Finjan to organize its infringement contentions by the underlying instrumentalities rather than into five groups of products, because that would assist both the parties and me in determining precisely how Check Point's products do or do not infringe Finjan's patents and to aid Finjan's efforts to provide specific source code citations. *Id.* at 7. Finjan was ordered to specify any combinations of the underlying instrumentalities that it believed were infringing. *Id.* Although it might be true that Check Point sells its products to consumers in bundles, I reasoned that separating out infringement contentions by the underlying instrumentalities would be consistent with the purpose of Patent Local Rules because it would make the litigation process more efficient and discovery more streamlined. *Id.*

Second, I ordered Finjan to provide pinpoint source code citations that show "where and how each limitation of each asserted claim is found within each Accused Instrumentality" as required by the Patent Local Rules. *Id.* at 12. In doing so, I rejected Finjan's arguments that its infringement contentions were sufficient to disclose its infringement theories because they provided an overall infringement analysis that included both source code citations and public information. *Id.* at 7-12. I noted that many of the same sets of source code within the same product category were cited across different claims of different patents. *Id.*

Third, I held that Finjan's infringement contentions impermissibly contained open-ended citations to exemplary products in violation of the Narrowing Order. *Id.* at 13-14. I found that Finjan's citation to numerous releases of Check Point's products were ambiguous and that it was unclear which releases applied to which products in the voluminous list cited by Finjan. *Id.* I then denied Check Point's motion to strike and ordered Finjan to serve amended infringement contentions that were in accordance with my IC Order, Narrowing Order, and Patent Local Rules. *Id.* at 15.

Finjan has now served its amended infringement contentions ("AICs") and Check Point argues that they are deficient in largely the same ways as before. Defendant Check Point Software Technologies, Inc. and Check Point Software Technologies, LTD.'s Motion to Strike Amended Infringement Contentions ("AIC MTS") [Dkt. No. 125-4].

**LEGAL STANDARD**

Patent Local Rule 3-1 requires:

> [A] party claiming patent infringement shall serve on all parties a 'Disclosure of Asserted Claims and Infringement Contentions[]' . . . [which] shall contain the following information:
>
> (a) Each claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. § 271 asserted;
>
> (b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus shall be identified by name or model number, if known. Each method or process shall be identified by name, if

3

> known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;
>
> (c) A chart identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.
>
> (d) For each claim which is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. Insofar as alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described.
>
> (e) Whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality.

"The overriding principle of the Patent Local Rules is that they are designed [to] make the parties more efficient, to streamline the litigation process, and to articulate with specificity the claims and theory of a plaintiff's infringement claims." *Bender v. Maxim Integrated Prods.*, No. 09-cv-01152-SI, 2010 WL 1135762, at *2 (N.D. Cal. Mar. 22, 2010) (alteration in original) (internal citation omitted). Patent Local Rule 3-1 is intended to require the plaintiff "to crystallize its theories of the case early in the litigation and to adhere to those theories once disclosed." *Bender v. Advanced Micro Devices, Inc.*, No. 09-cv-1149-EMC, 2010 WL 363341, at *1 (N.D. Cal. Feb. 1, 2010). It "takes the place of a series of interrogatories that defendants would likely have propounded had the patent local rules not provided for streamlined discovery." *Network Caching Tech., LLC v. Novell, Inc.*, No. 01-cv-2079-VRW, 2002 WL 32126128, at *4 (N.D. Cal. Aug. 13, 2002).

"[A]ll courts agree that the degree of specificity under Local Rule 3-1 must be sufficient to provide reasonable notice to the defendant why the plaintiff believes it has a 'reasonable chance of proving infringement.'" *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022, 1025 (N.D. Cal. 2010) (quoting *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000)). The local rules do not "require the disclosure of specific evidence nor do they require a plaintiff to prove its infringement case . . . a patentee must nevertheless disclose what in each accused instrumentality it contends practices each and every limitation of each asserted claim

4

to the extent appropriate information is reasonably available to it." *DCG Sys. v. Checkpoint Techs., LLC*, No. 11-cv-03792-PSG, 2012 WL 1309161, at *2 (N.D. Cal. Apr. 16, 2012).

## DISCUSSION

### I. MOTION TO STRIKE INFRINGEMENT CONTENTIONS

#### A. Grouping

Check Point claims that Finjan has violated the directives contained in the IC Order by renaming its "groups" of products as the instrumentalities themselves and then referring to the actual products in the groups as "features." AIC MTS at 15-18. Check Point states that within each group, Finjan's infringements charts remain directed to a handful of individual products and services but provide no infringement theories for most of the groups. *Id.* at 16.

Check Point identifies Finjan's charts as purporting to describe infringement theories on the following actual products:

- Network Security Products: IPS, Anti-Bot, Anti-Virus, Threat Emulation, Threat Extraction.
- Endpoint Security: Threat Emulation, Threat Extraction, AntiPhishing (zero phishing), Anti-Ransomware, Anti-Bot, Forensics, Anti-Exploit, Anti-Virus, Anti-Malware, SmartEvent.
- ZoneAlarm: Advanced Firewall, OSFirewall, Threat Emulation, Browser Protection.
- ThreatCloud: Threat Emulation.
- CloudGuard: CloudGuard SaaS.
- Sandblast Mobile.

*Id.* at 16-17. It asks that I strike the remaining contentions from the AICs. *Id.*

#### 1. Blade Architecture

As an example, Check Point considers Finjan's accusation of its "Blade Architecture" as infringing the '968 Patent. *Id.* at 17. According to Check Point, Finjan's definition of its Blade Architecture is overbroad and encompasses 24 different products that Finjan refers to as features, as well as numerous marketing terms and other vague and unidentified functionalities. *Id.* But its

actual claim chart for this contention is only directed to three products: Anti-Virus, Sandblast Threat Emulation, and Sandblast Threat Extraction. *Id.*; Appendix 1 – Source Code Citations ("Citation Chart") attached to AIC MTS [Dkt. No. 26-1]. Check Point argues that where Finjan has listed multiple instrumentalities that might infringe in combination, it must state how they do so and not force it, or the court, to guess. [Corrected] Reply in Support of Defendants Check Point Software Technologies, Inc. and Check Point Software Technologies, Ltd.'s Motion to Strike Amended Infringement Contentions ("AIC MTS Reply") at 7-8 [Dkt. No. 141-4].

In opposition, Finjan makes two arguments. First, it contends that the Blade Architecture Software is properly a single accused instrumentality because it is represented to customers that way. Plaintiff Finjan, Inc.'s Opposition to Defendant Check Point Software Technologies, Inc. and Check Point Software Technologies, Ltd's Motion to Strike Amended Infringement Contentions ("AIC MTS Oppo.") at 9-10 [Dkt. No. 131-4]. Finjan argues that the Blade Architecture Software constitutes a single product with various functionalities that satisfy various claim elements under a unified interface that allows them to be turned on and off individually. *Id.* Finjan asserts that if a particular blade functionality is not identified in the charts, then it is not accusing that functionality of infringement and that it is only accusing approximately half of the blade functionalities of satisfying a claim element. *Id.* at 11.

Second, Finjan argues that it organized its analysis into separate contentions for each blade functionality. *Id.* at 13-15. Pointing to its chart for the '494 Patent, Finjan states that it has identified different blade functionalities as meeting separate elements. *Id.* at 13. According to Finjan, it has specifically set forth the blades or other technologies that were used to meet each element as separate contentions and has specified the combinations of different blades used to infringe each patent. *Id.* at 14; US Patent No. 8,677,494 Malicious Mobile Code Runtime Monitoring System and Methods Chart (the "Blade Architecture '494 Patent Chart") attached as Ex E. to Cardis Decl. [Dkt. No. 125-11]. Thus, Finjan argues, the combinations created by these blades may lead to multiple different theories of infringement but are still limited by the different permutations of listed contentions. AIC MTS Oppo. at 14-15.

In the IC Order, I already rejected Finjan's first argument. Further, Finjan has failed to

follow the IC order with respect to its blade architecture chart. In my IC Order, I noted that Finjan had accused 42 discrete blades and ordered Finjan to organize its infringement contentions by the underlying instrumentalities that it was accusing. IC Order at 2, 7. To the extent that the number of accused blades appears to keep changing, a chart for each blade will crystalize precisely which blades Finjan is accusing.[1] Turning to Finjan's second argument, where Finjan accuses the blades of infringing in combination, the IC Order required it to specify the combination. *Id.* at 7. If I ignore the "blade architecture" label on Finjan's Blade Architecture '494 Patent Chart and instead interpret it as a combination chart containing different specific blades, Finjan has significantly improved the chart from its first attempt. But, as Check Point argues, it is not enough to simply list a number of blades that could, in combination, infringe upon the '494 Patent. Finjan must describe how such a combination would infringe. Does Finjan contend that the Anti-Virus blade's receiver function under limitation 10b combines with the downloadable scanner function of the Anti-Bot blade under limitation 10c? The chart does not say. Besides stating that the Threat Emulation blade's scanner combines with the receivers in the other blades, Finjan's chart does not adequately describe other combinations. '494 Patent Chart at 21. If every contention for every claim can be combined with every contention for every other claim in its chart, Finjan must state that. I strike these charts with leave to amend.

### 2. Check Point's Other Arguments

Check Point identifies two other examples where it contends that Finjan's charts are improper. First, Check Point states that Finjan's '844 Patent chart for "Check Point Endpoint Security" only discusses Endpoint Threat Emulation. AIC MTS at 17; US Patent No. 6,154,844 System and Method for Attaching a Downloadable Security Profile to a Downloadable ("the '844 Patent Chart") attached as Ex. H to Declaration of Alyssa Cardis in Support of Defendant Check Point Software Technologies, Inc. and Check Point Software Technologies Ltd.'s Motion to Strike

---

[1] The parties dispute whether the blades share source code or a single interface, but that issue is irrelevant to the purpose of Finjan's infringement contentions—requiring Finjan to crystallize its infringement theories early in the litigation so as to prevent the shifting sands approach to claim construction. *See Atmel Corp. v. Info. Storage Devices, Inc.*, No. 95-cv-1987-FMS, 1998 WL 775115, at *2 (N.D. Cal. 1998).

Amended Infringement Contentions ("Cardis Decl.") [Dkt. No. 125-12]. Yet Finjan still purports to accuse a wide variety of instrumentalities within "Check Point Endpoint Security" aside from Threat Emulation. AIC MTS at 17; Plaintiff Finjan, Inc's Supplemental Disclosure of Asserted Claims and Infringement Contentions and Document Production Pursuant to Patent Local Rules 3-1 and 3-2 ("Finjan Supplemental Disclosure") at 4-5, attached as Ex. A to Cardis Decl. [Dkt. No. 125-7]. Since Threat Emulation is the only instrumentality charted, Check Point asks that I strike the rest of the instrumentalities.[2] AIC MTS at 17.

Second, Check Point asserts that Finjan improperly continues to accuse marketing terms and product categories. *Id.* at 18. Check Point states that "ThreatCloud" is a marketing term that refers to a number of products and services. *Id.*; Declaration of Tamir Zegman in Support of Defendant Check Point Software Technologies, Inc. and Check Point Software Technologies Ltd.'s Motion to Strike Amended Infringement Contentions ("Zegman Decl.") at ¶ 8 [Dkt. No. 125-6]. It argues that Finjan defines ThreatCloud in multiple inconsistent ways that include multiple products and services, but only makes allegations against Threat Emulation. *Id.* Check Point asks that I strike all other allegations under the ThreatCloud instrumentality. *Id.*

I agree with Check Point on both counts. Indeed, Finjan's opposition addresses neither argument. Finjan's '844 Patent Chart deals only with the Threat Emulation instrumentality; the other accused products identified by Finjan in the chart are struck. These include the Check Point Blade Architecture, Check Point Appliances, Check Point Endpoint Security, and Capsule Cloud. Finjan Supplemental Disclosure at 4-5. Similarly, because Finjan does not rebut Check Point's statement that ThreatCloud is a marketing term and not a product itself, the allegations related to ThreatCloud are struck. If Finjan seeks to accuse the products that are sold under the ThreatCloud marketing term, it may amend to do so specifically.

### B.  Source Code Citations

Check Point next argues that the AICs lack source code citations for most accused

---

[2] Check Point also argues that the AICs related to Check Point Endpoint Security are deficient under Local Rule 3-1(b) because Finjan uses purely functional and open-ended terms. AIC MTS at 17-18.

products and that the citations provided are inadequate and unexplained. AIC MTS at 19-22. It contends that this is doubly troubling based on the way Finjan has grouped its contentions because it does not cite code from actual products (i.e. the Firewall blade or the URL Filtering blade) and instead cites code to a single product within the group to accuse all the products in the group. *Id.* at 20. According to Check Point, Finjan has failed to provide any source code citations for 30 of the 52 accused instrumentalities. *Id.* Check Point also claims that where Finjan does provide source code citations, they are often untethered to the claim language and lack any sort of explanation. *Id.* at 21-22.

Check Point cites to two examples. The first is to limitation 14f in the chart for US Patent No. 7,418,731 Method and System for Caching at Secure Gateways ("the Blade Architecture '731 Patent Chart") attached as Ex. J. to Cardis Decl. [Dkt. No. 125-14]. Limitation 14f concerns the use of a "security profile" and "profile cache," but the cited source code refers to "security policies" and a "security policy cache."[3] AIC MTS at 21; '731 Patent Chart at 79-80. The second involves the Blade Architecture '494 Patent Chart. There, Check Point identifies an instance of Finjan citing the same three source code files for all claim elements across all asserted patents. AIC MTS at 22; Blade Architecture '494 Patent Chart at 14, 35, 51.

Finjan counters that its source code citations are adequate and that it only used the same source code citations when the claim elements are similar and the specific technology is alleged to infringe the claim element the same way. AIC MTS Oppo. at 16. It also argues that the source code cited by Check Point on the Blade Architecture '494 Patent Chart is not actually the same (despite the fact that it is). *Id.* at 16 n.11. Next, Finjan argues that the examples Check Point cites are fabricated because Finjan only identified the emulation and extraction blades as infringing this claim and therefore it is irrelevant that the anti-virus and anti-bot blades' functionality is not mentioned.[4] *Id.* at 17.

---

[3] Finjan concedes that this source code citation is incorrect and characterizes it a "single anomaly" that it could have fixed before Check Point filed its motion, had Finjan been notified. AIC MTS Oppo. at 17.

[4] Check Point counters that Finjan's argument related to the emulation and extraction blades should fail because Finjan's '154 "Blade Architecture" chart accuses different sets of blades of infringing the asserted limitations. For limitation 6b, Finjan incorporates its contentions for

In reply, Check Point argues that the AICs still lack source code citations for most accused products and that the citations identified in the opposition are still deficient. AIC MTS Reply at 8-11. For example, Check Point identifies Finjan's contention for "Endpoint client with Zero-Phishing" against '154 Patent limitation 1b and argues that it just parrots claim language without providing relevant code to the limitation. *Id.* Rather, Finjan incorporates "the source code on emulation . . . and endpoint agent," without explaining what the code does, and why it is being incorporated, or even what "emulation" and "endpoint agent" are, or how they work with "Endpoint client with Zero-Phishing." *Id.* Then, Finjan cites one source code file, "the application programming interface for cloud to accept an incoming file," without explanation as to how, either alone or in conjunction with some unidentified other source code, this file does what Finjan says. *Id.* Check Point argues that this does not disclose how Finjan believes that "Endpoint client with Zero-Phishing" meets limitation 1b of the '154 patent. *Id.* Check Point also attached a table with extracted code citations and Finjan's explanations. *Id.*; Reply Appendix attached to AIC MTS Reply [Dkt. No. 139-5].

Check Point next contends that Finjan recycles code for both similar and different limitations, which is problematic. AIC MTS Reply at 9-10. According to Check Point, the same source code is cited for four limitations across three patents with four different descriptions (the '494 limitation 10b, '731 limitation 1d, '731 limitation 1e, and '731 limitation 1e). *Id.* Check Point also notes that Finjan's opposition does not address Check Point's argument that that no source code has been cited for 30 of the 52 accused instrumentalities. Check Point asks that I

---

limitation 1b, where it provided "contentions" for Threat Emulation, Anti-Virus, and "Anti-Virus and Anti-Bot." *Id.*; US Patent No. 8,141,154 System and Method for Inspecting Dynamically Generated Executable Code (the "Blade Architecture '154 Patent Chart") attached as Ex. 21 to Declaration of Kristopher Kastens in Support of Plaintiff Finjan, Inc.'s Opposition to Defendant Check Point Software Technologies, Inc. and Check Point Software Technologies Ltd.'s Motion to Strike Amended Infringement Contentions ("Kastens Decl."). [Dkt. No. 131-40]. Check Point states that Finjan confusingly incorporates some limitations while referencing Threat Emulation and Threat Extraction, resulting in no blade being charted across all limitations. AIC MTS Reply at 10-11. Threat Emulation is at least partially charted for limitations 6b and 6d, but not 6c. *Id.* Threat Extraction is mentioned briefly for limitation 6d. Anti-Virus and "AntiVirus and Anti-Bot" are charted only for limitation 6b, but not 6c or 6d. *Id.* As discussed in the section on Blade Architecture, if it is presenting a combination claim chart, Finjan must explain how the different blades work together to infringe its patent.

strike all instrumentalities with no source code citations with prejudice, and only allow the contentions listed in Check Point's Appendix 2 to continue. *Id.*

Finjan has already been directed to provide pinpoint source code citations for each limitation. To the extent that any or all of the 30 of the accused instrumentalities lack pinpoint citations, they are struck with prejudice. Where Finjan has used the same source code for different things, it may amend its infringement contentions to better explain why the same source code is applies to wholly different limitations.

### C. Doctrine of Equivalents

Check Point next argues that Finjan's doctrine of equivalents ("DOE") contentions also fall short. AIC MTS at 22-23. "The doctrine of equivalents holds that even if an accused product does not literally infringe the asserted claims of a patent, the product may infringe if the differences between the element of the accused product at issue and the claim limitation at issue are insubstantial." *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, No. 16-cv-07255-WHO, 2017 WL 5068568, at *2 (N.D. Cal. Nov. 3, 2017) (internal citation omitted). This requires "a limitation-by-limitation analysis, not a boilerplate reservation." *Cap Co. v. McAfee, Inc.*, No. 14-cv-05068-JD, 2015 WL 4734951, at *4 (N.D. Cal. Aug. 10, 2015) (internal citation omitted).

Check Point asserts that Finjan's DOE analysis is insufficient because it simply parrots the claim language and the "same function, way, and result" language from the doctrine's legal standard. AIC MTS at 22-23. Check Point identifies contention 5 of limitation 10c titled "Anti-Bot Technology has a Receiver – DOE" in the Blade Architecture '494 Patent Chart, which states that:

> Check Point Blade Architecture performs the same function as this element because it receives network traffic that is correlated to downloaded web content.
>
> Check Point Blade Architecture performs the same function the same way as this element because it receives the network traffic so that it can be used for malware detection.
>
> Check Point Blade Architecture achieves the same result as this element because content that is sent across the network is analyzed for malware.

Blade Architecture '494 Patent Chart at 18.

11

Finjan counters that its DOE analysis is sufficient because it provides tailored explanations for how each element is met under the required function-way-result test, and never parrots the claim language or uses boilerplate analysis. AIC MTS Oppo. at 18-21. As to the example above, Finjan claims that it explains how this element performs the same function, the same way and gets the same result through receiving network traffic for malware detection that is correlated to a downloadable. *Id.* at 20. Finjan argues that this is sufficient explanation to put Check Point on notice of Finjan's DOE claims. Finjan next cites its DOE analysis for US Patent No. 8,141,154 System and Method for Inspecting Dynamically Generated Executable Code at 22, attached as Ex. 22 to Kastens Decl. [Dkt. No. 131-42]. There Finjan provides a more fulsome explanation why "Mobile Products" is equivalent to "SandBlast Mobile." *Id.*

As to both of these examples, I am satisfied that the DOE analysis provides sufficient notice to Check Point about why Finjan contends that these products are equivalent. It is also notable that Finjan used a similar DOE analysis in its original charts and Check Point did not find it deficient before. Check Point's motion to strike on these grounds is denied.

### D.   New Instrumentalities

Check Point argues that Finjan has failed to show the requisite good cause to accuse new products in its amended AICs. AIC MTS at 23-24. Check Point notes that in my previous order, I allowed Finjan to add 16 previously-unidentified products if they were charted in conformity with the rest of the order. *Id.*; IC Order at 14. Check Point now claims that Finjan has added dozens more products, services, marketing terms, and other undefined functionalities and has not sought leave or shown good cause to do so. AIC MTS at 23-24.

In opposition, Finjan contends that it has not accused any new products because most of what Check Point identifies as new products are not even "products" according to Check Point, and are instead "New Marketing Terms and Undefined Functionalities Referenced in the Claim Charts." AIC MTS Oppo. at 21-22. Finjan also asserts that: (i) each term in Check Point's list describes a technology that Finjan has long accused of infringing; (ii) it properly identified the accused products before filing its AICs in its initial letter to Check Point on September 20, 2018; (iii) the Gaia operating system was long accused as the operating system undergirding Check

1   Point's Blade Architecture (and that it is not a separate, purchasable product); (iv) the products
2   were charted in its original contentions served in November 2018; and (v) if any of these are new
3   products, they have been charted in accordance with the IC Order. *Id.*
4         Check Point replies that it has identified thirteen new products in the AICs in addition to a
5   larger number of undefined technologies and functionalities that pop up without explanation in
6   Finjan's charts. AIC MTS Reply at 13-15; Appendix 3 attached to AIC MTS [Dkt. No.126-1]. It
7   states that although Finjan originally identified five of the thirteen new products in its initial
8   identification, it did not accuse them in its initial infringement contentions; in order to properly
9   accuse them in its AICs, Finjan requires leave and good cause. AIC MTS at 13. As to the Gaia
10  operating system, Check Point claims that it does not undergird the blade architecture and that it
11  has supported installing blades on the Windows operating system as well. *Id.* at 13-14.
12  Additionally, although Gaia is not separately sold, it is an operating system with distinct features
13  and source code from the blades, components, and services accused by Finjan. *Id.* at 14. As to the
14  other seven new accused products, Check Point argues that they were not part of "long identified
15  Blade Architecture" because the "Blade Architecture" was not accused in the initial infringement
16  contentions. *Id.* It also notes that it is of no moment if any of the allegedly new products have
17  been charted in accordance with my IC Order because leave and good cause is still required. *Id.*
18  Finally, it claims that Finjan's opposition fails to address the allegedly new undefined
19  functionalities and marketing terms listed in Appendix 3 and that if they are left in this case,
20  Finjan will leverage them to add new products down the line or to introduce new theories that
21  were not previously disclosed. *Id.* at 14-15.
22        I agree with Check Point. It is irrelevant that Finjan might have identified some of these
23  products in its initial letter to Check Point in September 2018 because it did not ultimately accuse
24  those products in its initial infringement contentions. Patent Local Rule 3-6 states that
25  "Amendment of the Infringement Contentions or the Invalidity Contentions may be made only by
26  order of the Court upon a timely showing of good cause." There is no exception for items
27  identified in letters. Further, although I let Finjan add new products to its initial infringement
28  contentions despite failing to seek leave or show good cause, I am not inclined to do so again.

13

1  Any products not charted in the initial infringement contentions are struck without leave to amend.

2        **E.**       **Finjan's Motion for Leave to File Supplemental Responsive Brief to Check
3                Point's Motion to Strike**

4        On June 21, 2019, Finjan sought leave to file a supplemental responsive brief to Check Point's motion to strike its infringement contentions. [Dkt. No. 166]. Check Point opposed the motion, arguing that the Civil Local Rules 7-3(d) only allow supplemental briefing to object to new evidence submitted in a reply brief or to notify the court of a new judicial opinion and that neither applies here. [Dkt. No. 171]. Check Point is correct; Finjan's motion is denied. Additionally, even if I were to grant leave, Finjan's brief argues only that Check Point understands Finjan's infringement theories as evidenced by its motion to amend its invalidity contentions, and therefore its motion to strike should be denied. [Dkt. No. 166-2]. This argument bears no weight. As discussed above, the purpose of infringement contentions under the patent local rules is not simply to put the defendant on notice, it is to require the plaintiff "to crystallize its theories of the case early in the litigation and to adhere to those theories once disclosed." *Bender*, 2010 WL 363341, at *1.

**II.**       **MOTION TO STRIKE ATTORNEY DECLARATION**

      Check Point moves to strike the declaration of one of Finjan's counsel, Ms. Linjun Xu. Defendants' Motion to Strike ECF No. 61-1 and to Compel Disclosure of Facts Relating Thereto ("Xu MTS") [Dkt. No. 137-4]. She filed the declaration in support of Finjan's opposition to Check Point's previous motion to strike Finjan's initial infringement contentions. Declaration of Linjun Xu in Support of Plaintiff Finjan Inc.'s Opposition to Defendants Check Point's Motion to Enforce Court Order and Strike Plaintiff's Infringement Contentions ("Xu Decl.") [Dkt. No. 61-1]. In the declaration, she states that "I have personal knowledge of the facts stated herein and can testify competently to those facts." *Id.* at ¶ 1. She then goes on to state that:

> Check Point's source code computer includes the following top-level directories labeled: 2016-01-01, 2017-01-01, and 2018-09-25. The three top-level directories in combination include at least at least 135,000 sub-folders and over 1.2 million of files. A rough count of the source code indicates that there are hundreds of millions lines of source code. As one example, the subdirectory "te" in the 2016 folder (listed in the paragraph below) alone includes at least 7.6 million lines

> of source code. Finjan has spent more than 100 hours, spanning over 3 weeks for reviewing the source code on Check Point's source code computer and spent over 200 hours in preparation for the infringement contentions.

*Id.* at ¶ 2. Xu later described other aspects of the structure and operation of Check Point's source code. *Id.* at ¶¶ 3-6.

Finjan's first visit to Check Point's source code review computer took place on September 6, 2018. Xu MTS at 2-3. Check Point's electronic visitor log shows that Xu signed into Check Point's office at 9:28 a.m. and signed out at 11:50 a.m on September 6, 2018. Declaration of Catarina Chennault in Support of Defendant Check Point Software Technologies, Inc. and Check Point Software Technologies, LTD.'s Motion to Strike ECF No. 61-1 and Compel Disclosure of Facts Relating Thereto at ¶¶ 2, 4 [ECF No. 138-15]. At no other time did she have an opportunity to review Check Point's source code because she never returned to Check Point's facilities and no code was printed from the machine prior to the hearing on Check Point's Motion to Strike. *Id.* at 4-7.

According to Check Point, Xu's declaration could not have been based on her personal knowledge and was therefore false for two reasons. First, at the time of her review, Check Point had only loaded 900,000 source code files to the review computer, 300,000 fewer files than described in her declaration. Xu MTS at 3. The remaining files were loaded on the source code computer after her September 6, 2018 review.[5] *Id.* When she reviewed the source code, it did not contain several of the folders about which she testified in her declaration, including the "mtp" subfolder (Mobile Threat Prevention), the "consumer_main," "aksa," and "ZADotNetUI" folders (Consumer Endpoint products), the "capsule-cloud" folder (CapsuleCloud), and the 2018-09-25 directory (CloudGuard SaaS). Zegman Xu Decl. at ¶ 5. Second, it would take several days to review and understand the roughly 900,000 source code files uploaded to the review computer on the date that she had access, and to understand all of the accused instrumentalities in this case

---

[5] These files related to the following blades and components: Mobile Threat Prevention, CapsuleCloud, Check Point's Consumer Endpoint products (ZoneAlarm), CloudGuard SaaS, Anti-Ransomware, Anti-Exploit, and Anti-Phishing. Declaration of Tamir Zegman in Support of Defendants' Motion to Strike ECF No. 61-1 and Compel Disclosure of Facts Relating Thereto ("Zegman Xu Decl.") at ¶¶ 4-6 [ECF No. 137-6].

would likely take several weeks. Xu MTS at 7; Zegman Xu Decl. at ¶¶ 7, 9.

Based on this, Check Point accuses Finjan's attorneys of violating Rule 3.3 of the California Rules of Professional Conduct, California Business and Professions Code § 6068(d), and Civil Local Rule 11-4, Xu MTS at 10-13, and asks me to strike the Xu Decl. under Federal Rule of Civil Procedure 16(f) and order Finjan to explain its conduct with regard to the declaration. *Id.* at 13-17. Check Point argues that the declaration should have been submitted by Finjan's technical expert and having Xu be the declarant was a tactic to avoid exposing the technical expert to deposition about his opinions. *Id.* at 1-2. It asserts that the declaration at issue is either the result of Xu's lack of foundation, or that Xu had a foundation of direct observation because she had access to the source code outside of the repository in violation of my protective order in this case. Defendants' Reply in Support of Motion to Strike ECF No. 61-1 and to Compel Disclosure of Facts Relating Thereto ("Xu MTS Reply") at 1 [Dkt. No. 172-4].

Finjan responds that the motion should be denied because the declaration is factually correct, it is not relevant to any pending motion or past ruling, and Check Point did not conduct a meet and confer on this issue prior to filing its motion. Plaintiff Finjan, Inc.'s Opposition to Defendants Check Point Software Technologies, Inc. and Check Point Software Technologies, LTD.'s Motion to Strike ECF 61-1 and to Compel Disclosure of Facts Relating Thereto ("Xu MTS Oppo.") [Dkt. No. 163-4]. In a subsequent declaration attached to Finjan's opposition, Xu says that her statements in the declaration at issue were based on two sources: (i) her review of the source code on September 6, 2018 and (2) working with Finjan's expert about his investigation including reviewing his notes "which was his work product from his source code review done at the direction of counsel." *Id.* at 2; Declaration of Linjun Xu in Support of Plaintiff Finjan, Inc's Opposition to Defendants Check Point Software Technologies, Inc. and Check Point Software Technologies, LTD.'s Motion to Strike ECF 61-1 and to Compel Disclosure of Facts Relating Thereto at ¶ 3 [Dkt. No. 164-1]. At the hearing on this motion, Xu elaborated that during her review she looked at what was "loaded onto the source code computer as well as how many files were there" and that she "opened selected files to take a look to see the functionality of certain files and folders," but that her declaration was based on her "review of the source code on the

source code computer" as well as "subsequent reviews by [Finjan's] export. Transcript of Proceedings at 18:17-21, 19:1-4 [Dkt. No. 190]. Finjan characterizes Check Point's argument that its expert should have been the declarant as a red herring because it would require delving into work product and that no deposition would be warranted to litigate Check Point's previous motion to strike infringement contentions. Xu MTS Oppo. at 9. Finjan believes that this motion is frivolous and only intended to harass. *Id.* at 13.

I agree with Check Point that Xu's declaration is problematic. Federal Rule of Evidence 602 requires a declarant to have personal knowledge of the matter. Fed. R. Evid. 602. An attorney declaration made without personal knowledge is entitled to no weight. *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995). If Finjan had wanted to introduce a declaration containing the information uncovered by its experts related to Check Point's source code, that declaration should have been from the experts with firsthand knowledge of Check Point's source code. It is appropriate to strike the declaration. But I am satisfied that Ms. Xu did not violate the Protective Order, and no further remedy is necessary.

### III. MOTION TO AMEND INVALIDITY CONTENTION

Check Point seeks leave to amend its invalidity contentions to: (i) add detail as to where and how the limitations of the asserted claims are found in each prior art reference, (ii) reduce and clarify its obviousness combinations, (iii) add four prior-art references, and (iv) add an invalidity contention based on one of its originally identified prior art references. Defendants Check Point Software Technologies, Inc. and Check Point Software Technologies, LTD.'s Motion to Amend Invalidity Contentions [Dkt. No. 129-4]. Finjan does not oppose Check Point's motion. Plaintiff Finjan, Inc.'s Statement of Non-Opposition to Defendant Check Point Software Technologies Inc.'s Motion to Amend Invalidity Contentions [Dkt. No. 165]. The motion is granted.

### IV. THE MOTIONS TO SEAL

The parties filed 10 administrative motions to file under seal in conjunction with the above motions. [Dkt. Nos. 125, 129, 131, 137, 138, 139, 141, 163, 172, 177].

On May 15, 2019, Check Point moved to seal a number of attachments to its AIC MTS reflecting and related to its "highly-confidential, commercially-sensitive, and proprietary trade

secret source code that is not publicly-known and would cause Check Point significant competitive harm should it be made public." [Dkt. No. 125]. It also states that "given the nature of the products at issue (network and computer security products), disclosure of the information in these documents could compromise the security of computers and networks protected by such products." *Id.* Check Point filed similar motions related to its Motion to Amend Invalidity Contentions, the Xu MTS, the AIC MTS Reply, and the Xu MTS Reply. [Dkt. Nos. 129, 137, 139, 131, 172]. Finjan also moved to seal portions of its opposition to the AIC MTS, Xu MTS, and declarations related to its Motion for Leave to File Second Supplemental Brief pursuant to Check Point's identification of its confidential source code. [Dkt. Nos. 131, 163, 177].

Records attached to non-dispositive motions are not subject to the strong presumption of access. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179-80 (9th Cir. 2006). Because the documents attached to non-dispositive motions "are often unrelated, or only tangentially related, to the underlying cause of action," parties moving to seal must meet the lower "good cause" standard of the Federal Rules of Civil Procedure Rule 26(c). *Id.* (internal quotation marks omitted). The "good cause" standard requires a "particularized showing" that "specific prejudice or harm will result" if the information is disclosed. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) (internal quotation marks omitted); see Fed. R. Civ. P. 26(c). "Broad allegations of harm, unsubstantiated by specific examples of articulated reasoning" will not suffice. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992).

I find that the parties have shown good cause to file the requested documents under seal and have narrowly tailored their requests to confidential information.

## CONCLUSION

Check Point's motion to strike the amended infringement contentions is granted in part. Finjan may amend its infringement contentions one last time within fourteen days of this Order. Moving forward, Finjan is cautioned that if any of its infringement contentions remain deficient, they may not form the basis for relief in this action. Check Point's motions to strike the Xu Decl.

and to amend its invalidity contentions are granted.

**IT IS SO ORDERED.**

Dated: August 12, 2019

William H. Orrick
United States District Judge