UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FINJAN, INC.,<br><br>             Plaintiff,<br><br>        v.<br><br>CHECK POINT SOFTWARE<br>TECHNOLOGIES, INC., et al.,<br><br>             Defendants. | Case No. 18-cv-02621-WHO<br><br>**ORDER GRANTING IN PART<br>MOTION TO STRIKE SECOND<br>AMENDED CONTENTIONS;<br>GRANTING IN PART MOTIONS TO<br>SEAL**<br><br>Re: Dkt. Nos. 212, 213, 223, 229, 231, 234,<br>241 |

I began the hearing on defendants Check Point Software Technologies, Inc. and Check Point Software Technologies Ltd. (collectively "Check Point") motion to strike plaintiff Finjan, Inc.'s ("Finjan") infringement contentions for the third time by hoisting onto the bench the six bankers' boxes of documents that had been filed to litigate the motion.  *See* Defendants' Motion to Enforce Court Order and Strike Second Amended Infringement Contentions ("MTS SAIC") [Dkt. No. 213].  Finjan's second amended infringement contentions ("SAICs") amount to 5,135 charts, totaling to over 185,000 pages.  This remarkably unreasonable filing hardly clarified Finjan's infringement theories.

I could not have resolved the propriety of the infringement contentions if I spent a month doing nothing else.  The absurdity of the Finjan's SAICs was underscored by its response to the tentative ruling I posted one day prior to the hearing.  After issuing two detailed orders striking Finjan's contentions and spending weeks to unravel the parties' positions as expressed in the briefing, my tentative was almost totally against Finjan.  At the start of the hearing, Finjan abandoned its positions in response to much of the tentative.  That may have been strategic, but it left me wondering why it made the abandoned contentions in the first place.

Locating the basis that Finjan asserts is contained for the infringement contentions is akin to going on an unsatisfying treasure hunt—you start with an appendix, move to a chart, and then look to pages in the chart that are supposed to contain the treasure, but instead refer to a totally different product.  As explained below, I am ruling against Finjan on most of the remaining issues that were briefed.

In normal litigation, that would be that.  I would issue an order resolving the issues and the parties would move to the next stage in the case.  But this is abnormal.  I do not pretend that I reviewed all of Finjan's 5,135 charts.  Nor do I intend to waste more time parsing through this mess contention by contention without briefing.  I will not assume that none of the unbriefed contentions pass muster, even though Finjan's two strongest contentions failed (I asked Finjan in the tentative to identify its two strongest contentions that clearly specify how the cited source code shows that the accused products infringe a particular patent, and I will discuss in this Order why even those lacked merit).

Check Point argues that the SAICs should be struck for six reasons (hereinafter "Issues 1-6").  For the reasons provided below, I strike with prejudice all contentions identified by Check Point under Issues 1, 2, 3, and 5.  I will appoint a master pursuant to Federal Rule of Civil Procedure 53  to determine if the other 69 combination charts should also be struck for failure to adequately identify and explain combinations, as argued in Check Point's Appendix C and Finjan's Rebuttal Appendix C.  *See infra* Section I.C (discussing Issue 3).  The master shall also determine if the entirety of the SAICs should be struck for inadequate source code citation explanations, as argued in Check Point's Appendix A, Finjan's Rebuttal Appendix A, and Check Point's Reply Appendix.  *See infra* Section I.F (discussing Issue 6).[1]

Finjan shall pay the master's fees and costs.  The master shall have the power to

---

[1] As a general matter, just because a contention crosses one of the issue hurdles, it does not necessarily mean that it is sufficiently alleged because it could fail to cross another issue hurdle.  I emphasize this because Finjan repeatedly argues that providing source code citations is enough to amount to a sufficiently alleged infringement contention.  That is just one hurdle; whether that source code citation is then adequately explained and connected to the claim limitation is another hurdle that it must cross as well.

recommend reallocating some or all of the fees to Check Point, and also to award attorney's fees to the prevailing party for the proceedings before her as a discovery sanction. While I suspect that Finjan would be well advised to substantially reduce the size of its SAICs before the master commences her review, I have not analyzed the issues not addressed in this Order and defer to the master's review of the issues before her.[2]

# BACKGROUND

## I.    FACTUAL BACKGROUND

### A.    Narrowing Order

In September 2018, I received briefing from the parties on how to manage this litigation in compliance with Federal Rule of Civil Procedure 1's mandate of a "just, speedy, and inexpensive determination of this action[.]" Order Re Case Narrowing and Infringement Contentions (the "Narrowing Order") [Dkt. No. 29]. I then ordered Finjan to serve its infringement contentions under specifications that largely follow the provisions of this District's Patent Local Rules as well as the guidance provided in the since withdrawn 2013 Model Order from the Federal Circuit. *See* Narrowing Order. Finjan was instructed to "include pinpoint source code citations . . . accompanied by the document production required by Patent Local Rule 3-2" and to also:

> (i) avoid open-ended citations to "exemplary" products and use of the terms "such as" and "for example"; (ii) set forth any infringement theories based on the doctrine of equivalents with limitation-by-limitation analyses; and (iii) for any indirect theories of infringement, identify the alleged direct infringement, the alleged acts of inducement or contribution to that infringement, and the relationship between them.

*Id.* at 2.

### B.    Order on Infringement Contentions

On November 2, 2018, Finjan served its infringement contentions on Check Point, which then moved to strike the infringement contentions, arguing that they violated my Narrowing Order and the Patent Local Rules. *See* Check Point's Motion to Enforce Court Order and Strike

---

[2] At the end of this Order I rule on the motions to seal. I will give the parties five days to review this Order before issuing it publicly to ensure that I have redacted the appropriate information in it. If there is any other portion that should be redacted, the parties should file a declaration in five days explaining why good cause exists to redact it.

United States District Court
Northern District of California

Infringement Contentions [Dkt. No. 55] 1-3, 15-24.  I largely agreed that Finjan's infringement

contentions failed to comply, and made several rulings that I summarize below. *See* Order

Granting Motion to Strike in Part; Granting Motions to Seal; Granting Motion to Amend Claim

Construction Schedule (the "IC Order") [Dkt. No. 84].

### 1.    Grouping

First, I required Finjan to organize its infringement contentions by the underlying

instrumentalities rather than into five groups of products, because that would assist both the parties

and me in determining precisely how Check Point's products do or do not infringe Finjan's patents

as well as to aid Finjan's efforts to provide specific source code citations.  IC Order at 7.  I ordered

that Finjan specify any combinations of the underlying instrumentalities that it believed were

infringing.  *Id.*  Although it might be true that Check Point sells its products to consumers in

bundles, I reasoned that separating out infringement contentions by the underlying

instrumentalities would be consistent with the purpose of Patent Local Rules because it would

make the litigation process more efficient and discovery more streamlined.  *Id.*

### 2.    Pinpoint Source Code Citations

Second, I ordered Finjan to provide pinpoint source code citations that show "where and

how each limitation of each asserted claim is found within each Accused Instrumentality" as

required by the Patent Local Rules.  IC Order at 12.  In doing so, I rejected Finjan's arguments

that its infringement contentions were sufficient to disclose its infringement theories because they

provided an overall infringement analysis that included both source code citations and public

information.  *Id.* at 7-12.  I noted that many of the same sets of source code within the same

product category were cited across different claims of different patents.  *Id.*

### 3.    Open-Ended Contentions

Third, I held that Finjan's infringement contentions impermissibly contained open-ended

citations to exemplary products in violation of the Narrowing Order.  IC Order at 13-14.  I found

that Finjan's citation to numerous releases of Check Point's products were ambiguous and that it

was unclear which releases applied to which products in the voluminous list cited by Finjan.  *Id.*

#### 4. New Instrumentalities

Fourth, I found that Finjan failed to show good cause to accuse 16 new instrumentalities not previously identified pursuant to the Narrowing Order. IC Order at 14. However, I permitted Finjan to add these 16 new instrumentalities to its next set of contentions so long as it did so "consistent with the order's guidance." *Id.* I granted Check Point's motion to strike in part and ordered Finjan to serve amended infringement contentions that were in accordance with my IC Order, Narrowing Order, and the Patent Local Rules. *Id.* at 15.

### C. Order on Amended Infringement Contentions

Finjan then served its amended infringement contentions ("AICs") and Check Point moved to strike the AICs, arguing that they were deficient in largely the same ways as before. *See* Defendants' Motion to Strike Amended Infringement Contentions ("MTS AIC") [Dkt. No. 126]. I agreed and made several rulings that I summarize below.[3] *See* Order Granting Motion to Strike Infringement Contentions in Part (the "AIC Order") [Dkt. No. 192].

#### 1. Grouping

First, Check Point argued that Finjan violated the directives in the IC Order by renaming its "groups" of products as the instrumentalities themselves and then referring to the actual products in the groups as "features." MTS AIC at 15-18. It identified Finjan's charts as purporting to describe infringement theories on the following actual products:

- <u>Network Security Products</u>: IPS, Anti-Bot, Anti-Virus, Threat Emulation, Threat Extraction.

- <u>Endpoint Security</u>: Threat Emulation, Threat Extraction, AntiPhishing (zero phishing), Anti-Ransomware, Anti-Bot, Forensics, Anti-Exploit, Anti-Virus, Anti-Malware, SmartEvent.

- <u>ZoneAlarm</u>: Advanced Firewall, OSFirewall, Threat Emulation, Browser Protection.

- <u>ThreatCloud</u>: Threat Emulation.

---

[3] I did deny Check Point's motion to strike to the extent that it argued that Finjan's doctrine of equivalents contentions fell short. AIC Order at 12.

United States District Court
Northern District of California

- <u>CloudGuard</u>:  CloudGuard SaaS.

- <u>Sandblast Mobile</u>.

*Id.* at 16-17.  It asked that I strike the remaining contentions from the AICs.  *Id.*

I found that Finjan failed to follow the IC Order requiring that it organize its infringement contentions by the underlying instrumentalities that it was accusing.  AIC Order at 7.  Where Finjan accused certain products of infringing in combination, it also failed to follow the IC Order directing it to specify the combination.  *Id.*  I struck these charts with leave to amend to specify the combination and describe how such a combination would infringe.  *Id.* at 7-8.

### 2.    Pinpoint Source Code Citations

Second, Check Point argued that the AICs lacked source code citations for most accused products and that any citations provided are inadequate and unexplained.  MTS AIC at 19-22.  It contended that Finjan failed to provide any source code citations for 30 of the 52 accused instrumentalities.  *Id.* at 20; *see* Appendix 1 - Source Code Citations, attached to MTS AIC [Dkt. No. 126-1] (hereinafter "Appendix 1"); Appendix 2 - List of Contentions for which Source Code Citations Provided for Each Element [Dkt. No. 126-1] (hereinafter "Appendix 2").

As I noted in the hearing on the MTS AIC, Finjan did not oppose this argument.  *See* Transcript of Proceedings held on July 10, 2019 [Dkt. No. 190] 3:12-17 ("Check Point says in its brief that there was no code cited for 30 of the 52 accused instrumentalities, and there wasn't a response to that in the briefing that I saw.  So if that's true, then I would grant that with prejudice and only allow the contentions that are listed in Check Point's Appendix 2 to continue.").  I found that Finjan had already been directed to provide pinpoint source code citations for each limitation and held that "[t]o the extent any or all of the 30 of the accused instrumentalities lack pinpoint citations, they are struck with prejudice."  AIC Order at 11.  Where Finjan used the same source code for different things, I allowed it to "amend its infringement contentions to better explain why the same source code [] applies to wholly different limitations."  *Id.*

### 3.    New Instrumentalities

Third, without seeking leave or showing good cause, Finjan's AICs expanded the scope of the case by accusing products, functionalities and marketing terms not previously identified.  AIC

1   Order at 12-14; *see* Appendix 3 - List of New Products Added to Finjan's Amended Infringement

2   Contentions, attached to MTS AIC [Dkt. No. 126-1] (hereinafter "Appendix 3").  I noted that

3   although I previously let Finjan add new products to its ICs, I was not inclined to do so again.

4   AIC Order at 13.  Accordingly, I struck all such new products and undefined instrumentalities.  *Id.*

5   at 14 ("Any products not charted in the initial infringement contentions are struck without leave to

6   amend.").

7        Altogether, I allowed Finjan limited leave to amend its infringement contentions "one last

8   time within fourteen days."  AIC Order at 18.  I cautioned that "if any of its infringement

9   contentions remain deficient, they may not form the basis for relief in this action."  *Id.*

10  **II.    PROCEDURAL BACKGROUND**

11        Following the AIC Order, Check Point sent Finjan a 36-page letter explaining many

12  examples of the deficiencies in Finjan's AICs.  *See* Declaration of Alyssa Caridis In Support of

13  Defendants' Motion to Enforce Court Order and Strike Second Amended Infringement

14  Contentions ("Caridis Decl."), Ex. A (copy of letter from C. Roberts to P. Andre dated August 20,

15  2019) [Dkt. No. 212-7].

16        On August 26, 2019, Finjan served its SAICs, containing 5,135 claim charts and totaling

17  more than 185,000 pages.  Caridis Decl., ¶ 2.  On October 18, 2019, Check Point filed a motion to

18  strike the SAIC.  *See* MTS SAIC.  Finjan filed an opposition, which it later retracted for a

19  corrected opposition.  *See* Corrected Plaintiff's Opposition to Motion to Enforce Court Order and

20  Strike Second Amended Infringement Contentions ("Oppo.") [Dkt. No. 232].  Check Point filed a

21  reply.  *See* Defendants' Reply In Support of Motion to Enforce Court Order and Strike Second

22  Amended Infringement Contentions ("Reply") [Dkt. No. 235].  I heard oral argument on

23  December 4, 2019.

24                              **LEGAL STANDARD**

25  Patent Local Rule 3-1 requires:

26        [A] party claiming patent infringement shall serve on all parties a 'Disclosure of
         Asserted Claims and Infringement Contentions[]' . . . [which] shall contain the
27        following information:

28

United States District Court
Northern District of California

(a) Each claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. § 271 asserted;

(b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus shall be identified by name or model number, if known. Each method or process shall be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;

(c) A chart identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.

(d) For each claim which is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. Insofar as alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described.

(e) Whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality.

"The overriding principle of the Patent Local Rules is that they are designed [to] make the parties more efficient, to streamline the litigation process, and to articulate with specificity the claims and theory of a plaintiff's infringement claims." *Bender v. Maxim Integrated Prods.*, No. 09-cv-01152-SI, 2010 WL 1135762, at *2 (N.D. Cal. Mar. 22, 2010) (alteration in original) (internal citation omitted). Patent Local Rule 3-1 is intended to require the plaintiff "to crystallize its theories of the case early in the litigation and to adhere to those theories once disclosed." *Bender v. Advanced Micro Devices, Inc.*, No. 09-cv-1149-EMC, 2010 WL 363341, at *1 (N.D. Cal. Feb. 1, 2010). It "takes the place of a series of interrogatories that defendants would likely have propounded had the patent local rules not provided for streamlined discovery." *Network Caching Tech., LLC v. Novell, Inc.*, No. 01-cv-2079-VRW, 2002 WL 32126128, at *4 (N.D. Cal. Aug. 13, 2002).

"[A]ll courts agree that the degree of specificity under Local Rule 3-1 must be sufficient to provide reasonable notice to the defendant why the plaintiff believes it has a 'reasonable chance of

proving infringement.'"  *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022,

1025 (N.D. Cal. 2010) (quoting *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986

(Fed. Cir. 2000)).  The local rules do not "require the disclosure of specific evidence nor do they

require a plaintiff to prove its infringement case . . . a patentee must nevertheless disclose what in

each accused instrumentality it contends practices each and every limitation of each asserted claim

to the extent appropriate information is reasonably available to it."  *DCG Sys. v. Checkpoint

Techs., LLC*, No. 11-cv-03792-PSG, 2012 WL 1309161, at *2 (N.D. Cal. Apr. 16, 2012).

<div align="center">

**DISCUSSION**

</div>

**I.**   **MOTION TO STRIKE SECOND AMENDED INFRINGEMENT CONTENTIONS**

Check Point moves to strike the SAICs with prejudice because Finjan: "(1) accuses

products and theories struck with prejudice by the Court; (2) asserts new theories, claims, and

combinations; (3) continues to accuse combinations without explaining which parts of the

combination meet which limitation or how the combination of products act together to infringe;

(4) relies on new open-ended contentions and citations to the entire code base for accused

instrumentalities; (5) has not provided pinpoint source code citations for numerous contentions;

and (6) still fails to specify *how* Check Point's products infringe Finjan's patents."  MTS SAIC 1-

2 (emphasis in original).

I provided parties with a tentative ruling on each of these six issues and ordered Finjan to

identify two of its strongest contentions in response to Issue 6 that clearly specified *how* the cited

source code shows that the accused products infringe a particular patent.  *See* Tentative Ruling

[Dkt. No. 242].  At the hearing, both parties presented arguments and, as indicated below, Finjan

stipulated to a number of my tentative rulings.  I address each issue below.

**A.**   **Issue 1: Finjan Continues to Accuse Products That Were Previously Struck
with Prejudice**

**1.**   **Issue 1(a): The SAICs include products previously struck because
Finjan did not provide source code citations in its AICs.**

In Check Point's previous motion to strike the AICs, it explained that Finjan failed to cite

any source code for 30 of the 52 accused instrumentalities.  MTS AIC 20.  Check Point

documented these 30 instrumentalities in Appendix 1 attached to its MTS AIC, which set forth

precisely where source code citations were provided and where they were missing. *See* Appendix 1 [Dkt. No. 126-1]; MTS SAIC 7. In my order striking the AICs, I held that "[t]o the extent that any or all 30 of the accused instrumentalities lack pinpoint citations, they are struck with prejudice." AIC Order at 11. Check Point now argues that despite my order, Finjan's SAICs continue to accuse products that were previously struck with prejudice. MTS SAIC 7.

Check Point uses three instrumentalities as examples: Network Firewall, Network Anti-Spam & E-mail Security, and Capsule Cloud. It contends that these three instrumentalities were struck with prejudice during the AIC round because Finjan did not provide any source code citations. MTS SAIC 7. Yet Finjan's SAICs includes these three products, and Check Point asks that I make clear that those products are not part of this case. *Id.*[4]

At the hearing, Finjan stipulated to striking 27 of the accused instrumentalities, but still argued that the three examples identified by Check Point should not be struck because pinpoint citations were provided in the AICs. For the reasons explained below, all 30 instrumentalities listed at the end of this section are struck with prejudice.

### a.    Network Firewall

Finjan contends that it cited "the very same code that Check Point confirmed the Firewall uses in its interrogatory responses." Oppo. 4; *see* Declaration of Kristopher Kastens ("Kastens Decl.") [Dkt. No. 225-13] ¶ 3; *see also id.*, Ex. 2 at 1, 5 (paper copy of Check Point's

---

[4] In addition to arguing that Finjan's factual assertions about the three examples are false, Check Point also contends that Finjan should be barred from relitigating this matter. Reply 1. It points out that Finjan never responded to its representations made in Appendix 1 during the AIC round, nor included any argument disputing its accuracy, in either its opposition or supplemental briefing. *Id.* Finjan did not contest the accuracy of the Appendices in the last hearing. *See* Transcript of Proceedings held on July 10, 2019 [Dkt. No. 190] 2:13-17. Check Point asserts that Finjan's attempt to seek reconsideration of the prior AIC Order should be rejected because it "submitted evidence about which products did not have pin citations, Finjan did not dispute that evidence, and the Court relied on that record in issuing its order." Reply 1-2.

It is true that Check Point made the assertion in its AIC briefing and Appendices that there were 30 instrumentalities that had no source code citations, and Finjan made no argument regarding the accuracy of that assertion. But I did not make a finding that those 30 instrumentalities were struck. There was no argument about the accuracy of that assertion. Instead, I held that "[t]o *the extent any or all of the 30* of the accused instrumentalities lack pinpoint citations, they are struck with prejudice." AIC Order at 11 (emphasis added). This question is not being "relitigated," as Check Point phrases it. But for different reasons, all 30 instrumentalities are struck with prejudice.

United States District Court
Northern District of California

1    Supplemental Response to Finjan's Interrogatory No. 9, which has been designated as source

2    code) (hereinafter "Rog. 9").[5]   As Check Point points out, this is false.  Reply 2.  Comparing the

3    source code cited by Finjan with Rog. 9 shows that Finjan did not cite any of the code categorized

4    as Network Firewall code.  *See* Rog. 9 at 1-7.  Finjan's argument fails.

5                        **b.      Network Anti-Spam & E-mail Security**

6            Finjan similarly argues that it cited to the same code that Check Point confirmed is used by

7    Anti-Spam.  Oppo. 5.  To support its argument, Finjan cites to the source code citations it provided

8    in its SAICs.  *See* Declaration of Lisa Kobialka in Support of Plaintiff Finjan, Inc.'s Opposition to

9    Defendants' Motion to Enforce Court Order and Strike Second Amended Infringement

10   Contentions ('Kobialka Decl.") [Dkt. No. 225-2] ¶ 14; *see also id.*, Ex. 11 at 7 [Dkt. No. 223-11]

11   (copy of SAIC chart "Appendix A - Network Anti-Spam & E-mail Security" for the '494 Patent).

12   But the issue here is whether Finjan accused this product in its AICs, or whether it failed to

13   provide any source code citations for it in its AICs such that it was previously struck with

14   prejudice.

15           Even if I look at the source code citations Finjan provided for Network Anti-Spam in its

16   SAICs, Check Point points out that Finjan cited to code that provides services *to* the Anti-Spam

17   blade, but did not identify code that is *part* of that blade.  Reply 3; *see* Rog. 9 at 44-45.  As Check

18   Point argues, this is "not a small distinction" because "for example Google's web servers provides

19   services *to* your Microsoft browser, but they are not *part* of your browser."  Reply 3.

20                        **c.      Capsule Cloud**

21           Finjan argues that it provides pincites for Capsule Cloud by incorporating by reference the

22   citations for other instrumentalities because Capsule Cloud is just the cloud version of those

23   blades.  Oppo. 4; *see* Kastens Decl., Ex. P at 1-4 [Dkt. No. 224-8] (copy of AIC chart "Appendix

24   A-6" for Capsule Cloud for the '494 Patent).  Check Point responds that this argument is also false

25   because Finjan's AICs did not cite to any Capsule Cloud code.  Reply at 3, n.3 (citing to

26

27   _____

     [5] As explained further in Section II of this opinion, a manual filing of this exhibit does not suffice.
28   Check Point must e-file an electronic copy under seal so that it is properly part of the record of this
     case.

United States District Court
Northern District of California

1    Declaration of Tamir Zegman In Support of Reply Brief to Strike Second Amended Infringement

2    Contentions [Dkt. No. 235-2] ¶ 11 (describing that there is a specific source code directory for

3    Capsule Cloud products but that Finjan's AICs have never cited to any code in that directory)); *see*

4    *also* Rog. 9 at 735 (list of Capsule Cloud source code).

5        Even if Finjan was attempting to claim that non-Capsule Cloud code shows infringement,

6    it does not explain that theory and instead simply provides a one-sentence incorporation by

7    reference placeholder for Capsule Cloud. I expressly directed Finjan to "better explain why the

8    same source code [] applies" to different things. AIC Order at 11. This example shows that

9    Finjan has failed to do that as to Capsule Cloud.

10        Accordingly, the following 30 instrumentalities are struck with prejudice. Finjan

11    stipulated to striking 27 of them and its arguments as to the three products discussed above fail.

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

United States District Court
Northern District of California

United States District Court
Northern District of California

1

"Check Point Blade Architecture"
1. **Firewall**
2. IPSec VPN
3. Identity Awareness
4. Advanced Networking and Clustering
5. Application Control
6. URL Filtering
7. **Anti-Spam & E-mail Security**
8. Data Loss Prevention (DLP)
9. Mobile Access Blade
10. Network Policy Management
11. Endpoint Policy Management
12. Next-Generation SmartEvent
13. Logging and Status
14. Compliance
15. SmartWorkflow
16. SmartProvisiong
17. Monitoring
18. Management Portal
19. User Directory
Endpoint Security (Enterprise)
20. SmartLog
ZoneAlarm
21. Two-Way Firewall
22. Antivirus and Anti-spyware
"ThreatCloud"
23. IPS
24. Anti-Bot
25. Anti-Virus
26. URL Filtering
27. Application Control
28. Private ThreatCloud
**"Capsule Cloud"**
29. No code cite. Only references "Check Point Blade Architecture" charts
"Check Point Appliances"
30. No code cite. Only references "Check Point Blade Architecture" charts

I strike these instrumentalities with prejudice because Finjan continues to cite unrelated code by referring to directories that are not related to the accused product. Check Point provided Finjan with its code for each accused product in Rog. 9 before Finjan served its AICs. It should have been able to cite to the proper code for each accused product.

  2. <u>Issue 1(b)</u>: **The SAICs include contentions previously struck because Finjan provided pinpoint citations for only some elements of an asserted claim in its AICs.**

Other than the 30 instrumentalities discussed above, there are contentions for some products that were stuck with prejudice because Finjan did not give pincites to all elements of that claim. MTS SAIC 8 (chart laying out which claims for certain products are incomplete); *see also* AIC Order at 11. Check Point argues that these contentions should be struck because Finjan

"previously included no source code citations [for some limitations] and which it has now tried to *add* some source code citations." MTS SAIC 7. At the hearing, Finjan stipulated to drop these contentions. I strike the following contentions:

| Product | Claims |
|---|---|
| Network IPS | '086 Patent: Claims 24, 42 |
| Network Anti-Virus | '731 Patent: Claims 2, 15, 16 |
| Network Threat Emulation | '633 Patent: Claims 9, 20 |
| | '154 Patent: Claims 3, 4, 6 |
| | '731 Patent: Claims 2, 15, 16 |
| Network Threat Extraction | '154 Patent: Claims 3, 4, 6 |
| Endpoint Threat Emulation | '494 Patent: Claim 15 |
| | '633 Patent: Claims 9, 20 |
| | '154 Patent: Claim 6 |
| | '844 Patent Claims 1, 41 |
| Endpoint Zero Phishing | '154 Patent: Claim 6 |
| Endpoint Anti-Ransomware | '633 Patent: Claims 8, 9 |
| Endpoint Anti-Bot | '154 Patent: Claim 3 |
| Endpoint Anti-Exploit | '633 Patent: Claims 8, 9 |
| | '154 Patent: Claim 3 |
| ZoneAlarm Threat Emulation | '494 Patent: Claim 15 |
| | '633 Patent: Claims 9, 14, 20, 34 |
| SandBlast Mobile | '494 Patent: Claim 15 |
| | '633 Patent: Claims 9, 14, 20, 34 |
| | '154 Patent: Claims 3, 4, 6 |
| ThreatCloud Threat Emulation | '633 Patent: Claims 9, 14, 20, 34 |

*Id.* at 8.

### 3.  <u>Issue 1(c)</u>: The SAICs allegations against CloudGuard, a marketing term, is understood to accuse the product CloudGuard SaaS.

Check Point argues that Finjan continues to accuse CloudGuard, which is a marketing term, not a product. MTS SAIC 8. It explains that Finjan's AICs accused the marketing term CloudGuard but included some limited code related to a single product under that umbrella, CloudGuard SaaS. *Id.* However, rather than heed the court's guidance rejecting Finjan's attempt to accuse marketing terms, Check Point asserts that Finjan is back to accusing the CloudGuard marketing term. It asks that all CloudGuard contentions should therefore be struck with prejudice.

Finjan responds that the AIC order did not address CloudGuard as a marketing term, but rather addressed the ThreatCloud marketing term, which was then struck with prejudice. Oppo. 7; AIC Order at 8. Finjan also points out that it accused "CloudGuard" in its previous infringement contentions and Check Point conceded that it understood this to refer to CloudGuard SaaS, which is what Finjan accuses now in its SAICs. *Id.*

1          Check Point does not respond to this argument in its reply brief.  To the extent that

2 Finjan's SAICs accuse the marketing term CloudGuard, it is understood that it is referring to the

3 product CloudGuard SaaS.  But, whether Finjan sufficiently alleged infringement contentions

4 against the CloudGuard SaaS product is a separate question that is not addressed here.

5       **B.**      **Issue 2: Finjan Includes New Accusations Without Seeking Leave to Amend**

6          Check Point contends that the SAICs mark the third time that Finjan is attempting to add

7 new material to this case without seeking leave or showing good cause.  MTS SAIC 8.  While my

8 AIC Order gave Finjan leave to amend for specific purposes, it did not allow Finjan to bring new

9 accusations.  *See* AIC Order at 13-14 ("Further, although I let Finjan add new products to its initial

10 infringement contentions despite failing to seek leave to show good cause, I am not inclined to do

11 so again.").  Check Point argues that the SAICs contain new accusations that generally fall into

12 three categories: (i) new products that were not accused in the AICs; (ii) assertions that previously

13 accused products infringe claims that were never previously asserted against that product; and (iii)

14 new accused combinations that were neither mentioned nor charted in the AICs.  MTS SAIC 9.  I

15 strike with prejudice: (i) products Network Firewall and Network Anti-Spam & Email Security

16 and the four contentions listed on page 16 of this Order; (ii) the new claims listed on the table on

17 page 18 of this Order; and (iii) the new combinations listed on the table on page 20 of this Order.[6]

18        **1.**      **Issue 2(a): The SAICs include new products and new contentions that**
                       **certain products infringe additional patents.**

19

20          Check Point made two arguments under this issue.  First, it argues that the AICs did not

21 include any contentions against products Network Firewall or Network Anti-Spam & E-mail

22 Security, yet Finjan now contends that these two products are infringing in the SAICs.  MTS

23 SAIC 10. Second, it asserts that there are several instances in which a product that was accused in

24 the AICs as infringing *some* asserted patent is now being accused of infringing wholly separate

25 patents:

26

27

28 _____

[6] Network Firewall and Network Anti-Spam & E-mail Security are also struck for reasons
indicated in Section I.A.1 of this opinion addressing Issue 1(a).

United States District Court
Northern District of California

- The AIC charts for the '494 Patent did not include any "Contention" for Endpoint Threat Extraction. At the hearing, Finjan agreed to strike this contention.

- The AIC charts for the '086 Patent did not include any "Contention" for Endpoint Threat Extraction. At the hearing, Finjan agreed to strike this contention.

- The AIC charts for the '633 Patent did not include any "Contention" for Network Anti-Virus. Finjan now accuses that product of infringing the '633 Patent.

- The AIC charts for the '154 Patent did not include any "Contention" for Network Threat Extraction. Finjan now accuses that product of infringing the '154 Patent.

*Id.*

For the reasons explained below, I find that Finjan did not provide any contentions for products Network Firewall and Network Anti-Spam & E-mail Security in its AICs. I also find that Finjan did not provide any contentions for Network Anti-Virus infringing the '633 Patent and Network Threat Extraction infringing the '154 Patent. Accordingly, Network Firewall and Anti-Spam, as well as all four contentions listed above, are struck with prejudice.

### a.    New Product: Network Firewall

Finjan argues that Network Firewall and Network Anti-Spam & E-mail Security were specifically accused in its AICs. Oppo. 8. But as Check Point demonstrates, every page cited in Finjan's Rebuttal Appendix is found buried within a contention for something else entirely. Reply 6.

Finjan cites to Rebuttal Appendix R.IV-A1 as proof that it had a contention for Network Firewall in its AICs. Oppo. 8. Here the treasure hunt begins. Rebuttal Appendix R.IV-A1 points to "Ex. 149, Appendix A-1" to purportedly show that Firewall was included in the AICs. *See* R.IV-A1 [Dkt. No. 223-7]. Exhibit 149 leads to the Check Point Blade Architecture Chart for the '494 Patent. *See* Kobialka Decl., Ex. 149 [Dkt. No. 223-23]. Finjan then identifies pages 12 and 20 of this chart. But those pages show a contention for Emulation technology, a wholly different product than Firewall.

### b.    New Product: Network Anti-Spam & E-mail Security

Similarly, Finjan cites to Rebuttal Appendix R.IV-A2 as proof that it had a contention for

1    Network Anti-Spam in its AICs.  Oppo. 8.  Rebuttal Appendix R.IV-A2 leads to "Ex. 149,

2    Appendix A-1" to purportedly show that Anti-Spam was included in the AICs.  *See* R.IV-A2 [Dkt.

3    No. 223-7].  Exhibit 149 points to the Check Point Blade Architecture Chart for of the '494 Patent.

4    *See* Kobialka Decl., Ex. 149 [Dkt. No. 223-23].  Then Finjan identifies pages 15 and 37 of this

5    chart.  But those pages show a contention for Anti-Virus technology, a wholly different product

6    than Anti-Spam.

7                    c.    **New Contentions to Additional Patents:** Network Anti-Virus
                          **Charts for the '633 Patent**

8

9            As a threshold matter, Finjan argued at the hearing that Check Point's Appendix 2

10   "admitted" that its AIC charts included a contentions Network Anti-Virus infringing the '633

11   Patent and Network Threat Extraction infringing the '154 Patent.  *See* Appendix 2 [Dkt. No. 126-

12   1].  However, as Check Point clarified, that appendix simply showed where Finjan had at least

13   some source code citations listed for certain claims.  It did not concede that those rose to the level

14   of valid contentions sufficient to provide notice and crystalize infringement theories under the

15   Patent Local Rules.  Providing source code citations is just one hurdle towards sufficiency; it does

16   not necessarily mean that Finjan also successfully jumped other hurdles, *e.g.*, whether there was an

17   explanation given that tied the source code citation back to the claim limitation.

18           In Rebuttal Appendix R.IV-Ba, Finjan argues that its AICs accused Network Anti-Virus

19   for the '633 Patent by pointing to Exhibit 154, Appendix B-3.  *See* R.IV-Ba [Dkt. No. 223-7].

20   Exhibit 154 directs to the Endpoint Security Chart for the '633 Patent.  *See* Kobialka Decl., Ex.

21   154 [Dkt. No. 223-23].  Finjan identifies pages 13 and 29 of this chart.  But those pages show a

22   contention for Anti-Malware and SandBlast, wholly different products than Network Anti-Virus.

23                   d.    **New Contentions to Additional Patents:** Network Threat
                          **Extraction for the '154 Patent**

24           Finjan asserts that its AICs included a contention that Network Threat Extraction infringes

25   the '154 Patent.  Oppo. 8 (citing to Kobialka Decl., Ex. 158 at 8 (copy of Check Point Blade

26   Architecture Chart for Claim 1 of the '154 Patent)).  The page cited shows the contention labeled

27   for Network Threat Emulation, not Network Threat Extraction.  *See id.* ("1b Contentions 1 –

28   Threat Emulation is the content processor").  The chart describes that "██████████████████

                                            17

█████████████████████████████████████████████

███████████████ but this does not indicate that a separate contention for Network Threat

Extraction alone was disclosed. *Id.*

In Rebuttal Appendix R.IV-Ba, Finjan argues that its AICs had accused Network Threat

Extraction for the '154 Patent by directing to a different exhibit than it did in its briefing. *See*

R.IV-Ba [Dkt. No. 223-7]. It cites to Exhibit 159, which points to the Check Point Endpoint

Security Chart for the '154 Patent. *See* Kobialka Decl., Ex. 159 [Dkt. No. 223-23]. Endpoint

Security Threat Extraction is not the same as Network Threat Extraction.

In short, Finjan's evidence that it accused certain products and certain patents in the AICs

is actually buried within a contention for something else entirely. Finjan's SAICs not only add

new products, but also add that a product is infringing another patent not previously disclosed.

Network Firewall and Anti-Spam, as well as all four contentions listed above, are struck with

prejudice.

## 2. <u>Issue 2(b)</u>: The SAICs include new claims.

Check Point argues that Finjan has changed its contentions regarding products that up to

this point had only been accused of infringing a claim in combination with other products so that

they are now accused as infringing on their own. MTS SAIC 11. My previous AIC Order only

provided Finjan with leave to explain the specific combinations that it was asserting; it did not

have leave to assert new claims that products also infringe on their own. *Id.*; AIC Order at 7.

Check Point asks that I strike these new claims:

| Product | Asserted Patent | AIC | SAIC |
|---|---|---|---|
| Endpoint Anti-Bot | '494 Patent | No contention for claim element 10b | Asserts infringement of claim 10 and dependent claim 14 |
| Network Threat Emulation | '154 Patent | No contention for claim element 6c | Asserts infringement of claim 6 |
| IPS | '086 Patent | No contention for claim element 24d or 42d. | Asserts infringement of claims 24 and 42 |
| Forensics | '086 Patent | No contention for claim element 42d. | Now contends Forensics meets claim element 42d. |

MTS AIC 11. At the hearing, Finjan stipulated to strike all but one of these contentions –

Endpoint Anti-Bot infringing Claim 10 of the '494 Patent.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### a.  Endpoint Anti-Bot for Claim 10 of the '494 Patent

Claim 10 of the '494 Patent includes a preamble limitation 10a and limitations 10b – 10d. Check Point argues that while Endpoint Anti-Bot is identified for limitations 10c and 10d, there is no contention that it satisfies limitation 10b and that, as a result, the AICs cannot be interpreted as contending Endpoint Anti-Bot infringes claim 10 of the '494 Patent on its own.  MTS SAIC 11.

Finjan responds by citing to page 5 of its Endpoint Security Chart of the '494 Patent. Oppo. 9 (citing Rebuttal Appendix R.IV-Bb [Dkt. No. 223-7]); *see* R.IV-Bb (citing Kobialka Decl., Ex. 150 at 5 [Dkt. No. 223-23]).  But there is no clear indication on that page that Endpoint Anti-Bot is accused for limitation 10b, which is a "receiver for receiving an incoming Downloadable." *Id.*  Instead, it vaguely states that some "Endpoint client has a Receiver." *Id.*  No receiver is identified, nor how it receives a "Downloadable," let alone what downloadable that might be.  This contrasts with how Finjan labeled its contentions for limitations 10c and 10d. *See id.* at 11 (label for limitation 10c as "Contention 3 – Anti-Bot Technology is a Downloadable Scanner"); *id.* at 24 (label for limitation 10d as "Contention 8 – Anti-Bot Technology has a Database manager").

At the hearing, Finjan again argued that Check Point's Appendix 2 from the AIC round is evidence that Check Point conceded that Finjan properly stated a contention for limitation 10b. That appendix only indicated that a source code citation was there; it does not say anything about whether there was a contention that addressed it.  Determining whether Finjan has provided source code citations and whether it has articulated enough to amount to a contention are two very different inquiries.

Accordingly, all four new claims identified by Check Point in the table above are struck with prejudice.

### 3.  Issue 2(c): The SAICs include new combinations.

In my previous AIC Order, I gave Finjan leave to amend to "describe how [its alleged] combinations[s] would infringe." AIC Order at 7.  Check Point argues that the SAICs now includes new combinations and new theories of infringement that were not described in the AICs. MTS SAIC 12.  It contends that these new accused combinations were neither mentioned nor

charted in the AICs. *Id.* It provides a table summarizing the new combinations that appear for different patents:

| New Combination in SAICs | Asserted Patent |
|---|---|
| ThreatCloud Emulation + ZoneAlarm Threat Emulation | '494 Patent |
| ZoneAlarm Threat Emulation + ThreatCloud Emulation + Browser | '494 Patent |
| ZoneAlarm Threat Emulation + ThreatCloud Emulation + ZoneAlarm Firewall | '494 Patent |
| Endpoint Threat Emulation + ThreatCloud Emulation | '633 Patent |
| ThreatCloud Emulation + ZoneAlarm Threat Emulation | '633 Patent |
| ZoneAlarm Threat Emulation + Browser + ThreatCloud Emulation | '633 Patent |
| ThreatCloud Emulation + ZoneAlarm Threat Emulation | '731 Patent |
| ThreatCloud Emulation + ZoneAlarm Threat Emulation + ZoneAlarm Firewall | '731 Patent |
| ZoneAlarm Threat Emulation + Antivirus, Anti-Spyware + ThreatCloud Emulation | '731 Patent |
| ZoneAlarm Threat Emulation + Browser + ThreatCloud Emulation | '731 Patent |
| Network Threat Emulation + ThreatCloud Emulation | '844 Patent |
| ZoneAlarm Threat Emulation + ThreatCloud Emulation + Browser | '086 Patent |
| ZoneAlarm Threat Emulation + Browser + ThreatCloud Emulation | '731 Patent |

*Id.*

At the hearing, Finjan stipulated to my tentative ruling to strike all the combinations in this table, except for Endpoint Threat Emulation + ThreatCloud Emulation infringing the '633 Patent and Network Threat Emulation + ThreatCloud Emulation infringing the '844 Patent. It argued, as to the combinations it still wants to assert, that it identified the same combinations that it disclosed in the AICs. Oppo. 9; *see* Rebuttal Appendix R.IV-Bc. However, as Check Point points out, in arguing that it had accused these product combinations in its AICs Finjan points to code cites that appear in the middle of claim charts for entirely different products. Reply 6.

**a.    Endpoint Threat Emulation + ThreatCloud Emulation for the '633 Patent**

In Rebuttal Appendix R.IV-Bc, Finjan argues that it did not accuse a new combination for Endpoint Threat Emulation + ThreatCloud Emulation as infringing the '633 Patent because this combination was included in its AICs. *See* R.IV.Bc at 25-30 [Dkt. No. 223-7]. This identifies Exhibit 154, Appendix B-3, which cites to numerous pages. At the hearing, Finjan focused on page 14 of this chart to argue that the references to "SandBlast" and "sandbox" is showing that ThreatCloud is accused. It admitted that this explanation was more attenuated than other examples discussed at the hearing because separately in its contentions, it defines ThreatCloud as

United States District Court
Northern District of California

one that "includes emulation technology using virtual machine sandboxes, which is sometimes also called 'SandBlast Cloud.'"  Burying combinations in this way cannot be considered adequate notice for Check Point.  I strike this new combination.

### b.  Network Threat Emulation + ThreatCloud Emulation for the '844 Patent

In Rebuttal Appendix R.IV-Bc, Finjan argues that it disclosed a Network Threat Emulation + ThreatCloud Emulation combination as infringing the '844 Patent in its AICs.  *See* R.IV.Bc [Dkt. No. 223-7].  This directs to Exhibit 164, Appendix F-1, which is the Check Point Blade Architecture Chart for the '844 Patent.  *See* Kobialka Decl., Ex. 164 [Dkt. No. 223-23].  In its opposition and at the hearing, Finjan focuses on page 7 of this chart to argue that its reference to ThreatCloud in the explanation shows a proper combination between Network Threat Emulation and ThreatCloud.  *Id.* at 7.  However, the contention on this page is labeled as "1b. Contention 2 – Threat Emulation Technologies Receives."  *Id.*  Although the explanation of this contention mentions ThreatCloud and includes a screenshot about ThreatCloud Emulation, it is one of only four times ThreatCloud is mentioned in this 85-page chart, which mostly refers to Network Threat Emulation.  *See id.* ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████"); *see also id.* at 5, 11, 83.  Burying another instrumentality in this way is not adequate notice.

During the last AIC round, Finjan argued that "[f]or the various blade functionalities in the Blade Architecture software package, [it] called out the specific functionalities and the different combinations of these functionalities that infringe."  Opposition to MTS AIC 5 [Dkt. No. 132].  To support this argument, it cited to its AIC chart titled "Appendix A-1" for Check Point Blade Architecture for the '494 Patent.  *See* Declaration of Alyssa Caridis in Support of Motion to Strike Amended Infringement Contentions [Dkt. No. 125-11], Ex. E at 36 ("The Anti-Virus technology is coupled to the receivers in Contentions 1, 4, and 6 of 10b.").  However, no such combination is called out in the same manner between Network Threat Emulation and ThreatCloud Emulation in its AIC chart for the '844 Patent.  After three rounds of infringement contentions, Finjan cannot

21

add this combination now.

All the new combinations listed in the table above are struck with prejudice.

**C.    Issue 3: Finjan Fails to Adequately Identify and Explain the Accused Combinations**

As I have held repeatedly, if Finjan accuses instrumentalities of infringing in combination it must both (i) specify which instrumentalities are combined and (ii) describe how that combination infringes.  *See* IC Order at 7 ("If Finjan believes that Check Point's underlying instrumentalities infringe in combination, Finjan must specify the combination."); AIC Order at 7 ("[I]t is not enough to simply list number of blades that could, in combination infringe . . . Finjan must describe how such a combination would infringe.").  Check Point argues that Finjan's SAICs "while improved in this in some places, still fall well short of this mark in others."  MTS SAIC 12.  Check Point points to three examples, and as discussed below, all three are struck with prejudice.

In addition to the three examples that were briefed, Check Point submits its Appendix C for a list of other combinations that should also be struck.  *See* Appendix C [Dkt. No. 213-3] (list of 69 deficient combination charts).  Finjan responds with its own Rebuttal Appendix C and argues that the combinations should not be struck because it provided adequate explanations.  *See* Rebuttal Appendix C [Dkt. No. 223-9] (explanations why the 69 combination charts are not deficient).  The master will decide whether these combination contentions should also be struck.

**1.    Issue 3(a): The SAICs do not identify and explain how SmartEvent or Forensics infringe the '494 and '086 Patents in combination with other accused instrumentalities.**

Finjan claims that SmartEvent and Forensics products infringe on its '494 and '086 patents in combinations with other Check Point products, but Check Point argues that it does not explain "*how* SmartEvent of Forensics work together with other accused products to infringe any of the asserted claims."  MTS SAIC 13.

Check Point contends that Finjan's '494 chart for Forensics only charts that product against limitation 10d, while stating that "Forensics can be combined with any other Endpoint Security Instrumentality in Appendixes A for element 10d."  Caridis Decl., Ex. K at 2 (copy of "Appendix A - Forensics" chart for '494 Patent) [Dkt. No. 212-8].  Similarly, the '086 chart

22

1    accuses Forensics of practicing only limitations 42c and 42d while stating that Forensics may be

2    combined with "any of the Endpoint Security Products in Appendix G for elements 42c and 42d."

3    *Id.*, Ex. L at 2 (copy of "Appendix G – Forensics" chart for '086 Patent) [Dkt. No. 212-8].  It

4    asserts that Finjan's SmartEvent and Endpoint SmartEvent charts likewise allege that those

5    products meet only a few claim limitations and contain the same generic "combination" language

6    as the Forensics charts.  MTS SAIC 13.

7           Finjan initially responds by explaining how Network Anti-Virus combined with Threat

8    Emulation infringes the '633 Patent.  *See* Oppo. 11.  As Check Point points out in its reply, it did

9    not assert this combination was deficient.  Reply 6.  But this serves as a good example of what a

10   combination explanation should look like because "Finjan actually did say *which* accused

11   instrumentality it was alleging to meet *which* limitation for that combination," which it did not do

12   for the challenged combinations, *i.e.*, SmartEvent and Forensics.  Reply 6-7; *see* Kobialka Decl.,

13   Ex. 38 at 3 (copy of "Appendix B(2) - Network Anti-Virus and Threat Emulation" chart for '633

14   Patent) [Dkt. No. 223-13] ("███████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████

17   ███████████████████████████████████").

18          As to the challenged combinations, Finjan simply responds by arguing that it "always

19   accused SmartEvent and Forensics as infringing combinations with various specific blades."

20   Oppo. 12.  It contends that its SAICs identified in two individual charts how SmartEvent and

21   Forensics satisfy the database manager element (limitation 10d) for specific blades, which were

22   separately charted, thereby creating a combination of the specific blade with SmartEvent or

23   Forensics.  *Id.*  It argues that "the combination of SmartEvent or Forensics with a blade would

24   have required [it] to create at least another 2,000 charts.  *Id.* at 11 n.2.

25          That said, Finjan does not specify which instrumentalities are combined.  Instead, it only

26   states that SmartEvent and Forensics can be combined with any of the charted Endpoint Security

27   Instrumentalities, Network Security Instrumentalities or Appliances:

28          • Kobialka Decl., Exs. 6 at 2, 7 at 2, 15 at 2 [Dkt. No. 223-11] (Charts for '494 Patent)

United States District Court
Northern District of California

- o "Forensics can be combined with any other Endpoint Security Instrumentality in Appendices A for element 10d."
- o "SmartEvent can be combined with any of the Endpoint Security Instrumentalities in Appendix A for element 10d."
- o "SmartEvent Instrumentality can be combined with any of the Network Security Instrumentalities or Appliances in Appendix A to meet element 10d."
- • Kobialka Decl., Exs. 127 at 2, 128 at 2, 136 at 2 [Dkt. No. 223-21] (Charts for '086 Patent)
  - o "The Forensics Instrumentality can be combined with any of the Endpoint Security Products in Appendix G for elements 42c and 42d."
  - o "The SmartEvent Instrumentality can be combined with any of the Endpoint Security Instrumentalities in Appendix G for elements 42(c) and (d)."
  - o "SmartEvent can be combined with any of the Network Security and Appliance Instrumentalities for Appendix G for element 24d."

Not only does Finjan not identify the combinations but it also does not explain how Forensics or SmartEvent work with any of other products in a manner that infringes.

At the hearing, Finjan again argued that it only charted this combination for one element because otherwise it would have been required to include an additional 2,000 charts to the 5,135 charts already submitted in its SAICs. Regardless, it conceded that it will "live with the consequences for that." For the reasons stated above, charts contending that SmartEvent and Forensics products infringe on the '494 and '086 Patents in combinations with other products are struck with prejudice.

### 2. Issue 3(b): The SAICs do not assert that Network Firewall practices any limits of the '968 '154 and '731 Patents.

Check Point argues that Finjan's SAICs accuse combinations, where, even under Finjan's own theory, at least one of the accused products does not practice any of the claim limitations. MTS SAIC 14. For example, it contends that Finjan's combination accusation of Network Firewall and Threat Emulation blades as infringing the '968 Patent only has a specific reference to

24

the Firewall blade for limitation 1c.  *Id.*; Caridis Decl., Ex. O at 14 [Dkt. No. 212-8] (copy of

"Appendix E – Firewall + Threat Emulation" chart for the '968 Patent) ("The Firewall component

passes content on for emulation for scanning digital content received."); Kobialka Decl., Ex. 101

(also a copy of "Appendix E – Firewall + Threat Emulation" chart for the '968 Patent).  But Check

Point argues that "*passing* content on for emulation and scanning is not a requirement of limitation

1c (or any other claim limitation)."  MTS SAIC 14 (emphasis in original).  It points out a similar

occurrence for limitation 33c, where Finjan states "The Emulation technology works with the

Firewall component to pass content on for emulation.  Caridis Decl., Ex. O at 28.  Again, it

argues that passing content for emulation is not a requirement of element 33c or any other

limitation of claim 33.  MTS SAIC 14.

Check Point also asserts that Finjan's combination of Network Firewall and Threat

Emulation blades against the '154 and '731 Patents is similarly flawed.  MTS SAIC 14.  For

example, for the '731 patent, Finjan asserts Network Firewall against the "retrieving a request file"

limitations, but makes the same statements that this product at most receives and passes content on

to the Threat Emulation blade.  Accordingly, it argues that Finjan does not explain how citations

for "receiving" content also support "retrieving requested files."  MTS SAIC 14.

Finjan responds that Check Point's argument that "passing content on for emulation and

scanning is not a requirement of limitation 1c [of the '968 Patent]" attempts to insert a claim

interpretation issue into its motion to strike and should be disregarded.  Oppo. 13.  It nonetheless

argues that it specifically set forth how Firewall is used in combination with Threat Emulation to

infringe the three exampled patents.  *Id.*  As Check Point has shown, Finjan's statement for

Firewall + Threat Emulation is virtually identical to the statement for Threat Emulation alone,

which means that it does not show specifically how Firewall is used in combination with Threat

Emulation.  Reply 8.

Finjan quotes the following statement from its Firewall + Threat Emulation Chart: "██████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████."  Kobialka Decl., Ex. 101 at 12 (copy of

1    "Appendix E – Firewall + Threat Emulation" chart for '968 Patent).  This is precisely the

2    statement it made regarding Threat Emulation standing alone: "███████████████

3    ████████████████████████████████████████████

4    ████████████████████████████████████████████"  *Id.*, Ex. 100 at 12 (copy of

5    "Appendix E - Threat Emulation" chart for '968 Patent).

6          Finjan does not explain how Firewall and Threat Emulation work in combination in a

7    manner that infringes.  Charts and allegations against the combination of the Network Firewall and

8    Threat Emulation blades for the '968, '154, and '731 Patents are struck with prejudice.

9                 **3.**    **Issue 3(c): The SAICs do not identify whether Anti-Bot or Anti-Virus**

10                      **practice limitations of the '154 Patent claims or show how they work**
                        **together.**

11         Check Point also argues that Finjan's chart accusing Network Anti-Bot and Anti-Virus

12   blades as infringing the '154 Patent does not explain which product purportedly practices which

13   limitations or how the products work together to practice a limitation.  MTS SAIC 15.  At the

14   hearing, Finjan stipulated to striking this combination.

15         The three examples discussed in this section are struck with prejudice.  The master shall

16   determine if the other 69 combination charts referenced in Check Point's Appendix C and Finjan's

17   Rebuttal Appendix C should be struck as well.

18             **D.**    **Issue 4: Finjan's Block Citations in its SAICs are to Show Operability of**
                    **Pinpoint Citations, and Therefore Do Not Violate Prohibitions on Open-Ended**

19                  **Citations**

20         Check Point argues that Finjan violates previous court orders by continuing to include

21   open-ended citations to dozens of entire source code directories in each contention.  MTS SAIC

22   16.  It asserts that "in nearly all of its five thousand one-hundred and thirty-five (5,135) charts,

23   Finjan included long lists of top-level source code directories, only some of which are related to

24   whatever instrumentality is accused for that particular limitation, and none of which are

25   'pinpoint.'"  MTS SAIC 16.  It contends that after each set of pinpoint cites, Finjan then cites to

26   tens of millions of lines of code and says that these too *may* be the "overall structures" it is

27   accusing of infringement.  *Id.* 16-17.  It also argues that some of the cited directories are not even

28   related to the accused product, and that Finjan has no excuse for this deficiency given that Check

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Point provided Finjan an 800-page discovery response that identified and mapped the code for

2    each accused product, as well as identifying all the code that provides services to each accused

3    product.  *Id.* at 17 (citing to Rog. 9).

4         Check Point cites to another case in this District where Finjan followed pinpoint code

5    citations by block cites of thousands of lines of code and entire code files.  *See Finjan, Inc. v.*

6    *Bitdefender, Inc., et. al.*, No. 17-cv-04790-HSG (TSH) (N.D. Cal. Jul. 26, 2019), Dkt. No. 149.  In

7    that case, Magistrate Judge Thomas S. Hixson found that these block cites "leave[] Finjan open to

8    later contend that somewhere in the block cites is additional infringing code," and barred Finjan

9    from relying on the additional block cites to show infringement.  *Id.*  Similarly, Check Point

10   argues, I should strike Finjan's open-ended lists of code directories and limit Finjan to accusing

11   the specific pinpoint citations it has provided for each limitation.  MTS SAIC 17.

12        In its opposition, Finjan argues that it identified the directories because they are necessary

13   for operability of the pincites and for context.  Oppo. 15.  It asserts that the list of source code

14   directories in its charts is explicitly described as follows: "[t]he preceding pinpoint source code

15   citations are source code that Finjan intends to rely on at trial to show infringement of this

16   limitations while the following citations are the source code that identifies the overall structure or

17   references the infringing components and *may be required for the operability of the pinpoint*

18   *citations of source code*."  Caridis Decl., Ex. R at 8 [Dkt. No. 212-8] (copy of "Appendix C -

19   Network Anti-Bot + Anti-Virus" chart for the '154 Patent) (emphasis added).  It clarifies that

20   these directories "were not identified as being part of Finjan's pincites (*i.e.* Finjan will not rely on

21   files in these directories to show infringement at trial), but rather to provide the overall structure of

22   the source code that may be referenced in Finjan's pincites."  Oppo. 15.

23        Finjan also clarifies that Judge Hixson found such an explanation would be helpful in

24   providing context to pincites considered by an expert.  *See* Kastens Decl., Ex. L [Dkt. No. 225-27]

25   (July 2019 Order in *Finjan, Inc. v. Bitdefender, Inc., et. al.*) ("At the hearing, Finjan explained that

26   the pinpoint citations that precede the block cite show the code that infringes that limitation and

27   that the block cite is to other code that is called by the infringing code in order for the software to

28   operate.  The Court understands that as a functional matter, you can't operate just the infringing

27

code – it won't work, and therefore in a technical sense won't 'infringe,' unless it is used with other code to make it operable."); *see also id.* ("Specifically, before each block cite Finjan must explain that the preceding pinpoint citations are the code Finjan relies on to show infringement of that limitation, and the block cite that follows is merely other code that is needed to make the infringing code for that limitation operate.  In other words, Finjan must clarify that it is relying only on the pinpoint citations as identifying the infringing code for each limitation.").

Given that Finjan has added disclaimers before its block citations that clarify that these citations are not to show infringement but to provide context of the operability of its pinpoint source code citations, they need not be struck from the SAICs.

> **E.**      **<u>Issue 5</u>: Finjan Fails to Provide Pinpoint Source Code Citations for Numerous Contentions**

Check Point argues that Finjan's SAICs continue to include contentions that do not include any source code citations or have source code citations that are extremely deficient because they cite code for only portions of a limitation.  MTS SAIC at 17; *see id.* at 18 (table of missing or deficient source code citations):

//
//
//
//
//
//
//
//
//
//
//
//
//

| Patent | Product | Claims | Issue |
|--------|---------|--------|-------|
| '633 | SandBlast Mobile | 9, 20 | No code |
| '633 | Network Anti-Virus | 9 | No code |
| '633 | ZoneAlarm Threat Emulation + Zone Alarm Browser Protection | 9, 20 | No code |
| '633 | ZoneAlarm Threat Emulation + Zone Alarm Browser Protection + ThreatCloud Threat Emulation | 9, 20 | No code |
| '633 | ZoneAlarm Threat Emulation + ThreatCloud Threat Emulation | 14c, 34b | No code |
| '633 | ZoneAlarm Threat Emulation | 14c | No code |
| '633 | ThreatCloud Threat Emulation | 14c | No code |
| '633 | Anti-Spam & Email Security | 9 | No code |
| '154 | SandBlast Mobile | 3, 4c, 4e, 6b | No code for 4e; code for only a portion of 4c, 6b |
| '154 | Endpoint Anti-Bot | 3 | No code |
| '154 | Endpoint Zero-Phishing | 3, 6 | No code |
| '154 | Endpoint Anti-Exploit | 4d | No code |
| '731 | Anti-Spam & Email Security | 2, 16 | No code |
| '731 | Network Anti-Virus | 2, 16 | No code |
| '731 | Sandblast Mobile | 17c | No code |
| '086 | Endpoint Anti-Bot | 42d | Missing entire contention for this limitation |
| '494 | SandBlast Mobile | 14, 15 | No code |
| '494 | ZoneAlarm Threat Emulation | 14, 15 | No code |
| '494 | ZoneAlarm Threat Emulation + Browser Protection | 14, 15 | No code |
| '494 | ZoneAlarm Firewall + ZoneAlarm Threat Emulation | 14, 15 | No code |
| '494 | Endpoint Anti-Virus | 14 | No code |
| '494 | ZoneAlarm Threat Emulation + ZoneAlarm Browser Protection | 14, 15 | No code |

At the hearing, Finjan argued that it did give pinpoint citations for five of these contentions in its AICs, but due to typographical error it did not get carried over to the SAICs. Nonetheless, it stipulated to my tentative ruling that all the contentions in the above table be struck. All the contentions referenced in the chart above are struck with prejudice.

### F.     Issue 6: Finjan Fails to Explain How the Cited Source Code Shows Infringement

Check Point contends that Finjan's SAICs fail to crystalize its theories because much of the cited source code remains unexplained and untethered to actual claim language. MTS SAIC 19. It argues that "[n]early all of Finjan's 5,135 claim charts fail to fully set forth how a "particular set of source code practices the asserted claim limitation," which is something I ordered it to do in the first IC Order. *Id.* (quoting IC Order at 9); *see also* IC Order at 11 ("It is Finjan's obligation to identify the particular claim components in each claim, map those

United States District Court
Northern District of California

1    components onto the features of the allegedly infringing products, and pinpoint cite source code

2    that practices that component.").

3        In response to my directive from the AIC hearing that the parties work together in an effort

4    to improve Finjan's infringement charts, Check Point asserts that it "sent Finjan a 36-page letter

5    specifically identifying and explaining deficiencies in Finjan's past set of infringement contentions

6    *before* the SAICs were served."  MTS SIAC 19.  It says that Finjan addressed very few of the

7    deficiencies, and although the charts are finally directed at individual products, the substance has

8    not changed.  *Id.*  Rather, Finjan "frequently parrots the claim language, fails to explain what its

9    theory of infringement is or how the code supports any such theory, and completely fails to even

10   address entire elements of certain claims."  *Id.*  Check Point attaches Appendix B to its motion,

11   showing the extent to which Finjan failed to address the deficiencies highlighted in its letter.  MTS

12   SAIC 19; *see* Appendix B [Dkt. No. 212-6].

13       Check Point requests that I strike the entirety of Finjan's SAICs with prejudice for Finjan's

14   failure to explain its theories.  MTS SAIC 19.  In other words, Check Point argues that not a single

15   full claim is properly explained by Finjan.  *Id.* at 21.  It submits Appendix A to illustrate that

16   Finjan fails to explain how the cited source code shows the accused products meet the

17   requirements of the asserted claims for at least one claim limitation in every allegation in the

18   SAICs.  *See* Appendix A [Dkt. No. 212-5].  Finjan submits Rebuttal Appendix A, totaling about

19   240 pages, to argue that its explanations are sufficient.  *See* Rebuttal Appendix A [Dkt. No. 223-

20   9].  Check Point submits a Reply Appendix, totaling about 320 pages, responding to Finjan's

21   arguments.  *See* Reply Appendix [Dkt. No. 234-5].

22       In the alternative, Check Point requests that I at least strike the examples it addressed in its

23   letter to Finjan identifying deficiencies, as discussed in its Appendix B.  MTS SAIC 21, n. 8; *see*

24   Appendix B [Dkt. No. 212-6] (showing how Finjan failed to fix deficiencies pointed out in letter);

25   Caridis Decl., Ex. A (copy of letter from C. Roberts to P. Andre dated August 20, 2019) [Dkt. No.

26   212-7].

27       In light of Check Point's request for broad relief, I ordered Finjan to present two of its

28   strongest contentions where it has clearly specified *how* the cite source code shows that the

United States District Court
Northern District of California

accused products infringe a particular patent.  *See* Tentative Ruling [Dkt. No. 242].  At the hearing, Finjan presented its Endpoint Threat Emulation chart for the '731 Patent and Network Anti-Virus chart for the '844 Patent.

The examples provided in the briefing and the two examples Finjan presented at the hearing show that Finjan has failed to adequately explain its source code citations.  For the reasons described below, under Issue 6(a) I strike the following with prejudice: (i) Network IPS infringing Claim 1 of the '731 Patent; (ii) Endpoint Threat Emulation infringing Claim 17 of the '731 Patent; and (iii) Network Anti-Virus infringing Claim 1 of the '844 Patent.  The examples also show that Finjan provides the exact same source code and almost identical explanations for different limitations and does not cite additional code beyond what overlaps.  Under Issue 6(b), I strike the following with prejudice: (i) Network IPS infringing Claim 10 of the '494 Patent and Claim 1 of the '731 Patent; and (ii) Network Anti-Virus infringing Claims 1 and 15 of the '844 Patent.

However, I cannot determine if such failure is rampant throughout Finjan's SAICs given the sheer volume of the SAICs and the parties' arguments presented in the appendices.  The master shall determine whether any or all contentions should be struck (a) due to inadequate source code explanation and/or (b) because the same source code is cited for different limitations, different patents, and different products without explaining why the same source applies in these difference cases.

     1.    **Issue 6(a): The source code citations in the SAICs remain largely untethered and unexplained to the language of the asserted claims.**

        a.    **Example in Briefing: Network IPS for Claim 1 of the '731 Patent**

For limitation 1b of the '731 Patent, Finjan is required to show:

> [A] scanner for scanning incoming files from the Internet and deriving security profiles for the incoming files, wherein each of the security profiles comprises a list of computer commands that a corresponding one of the incoming files is programmed to perform[.]

Caridis Decl., Ex. U (copy of "Appendix D - Network IPS" chart for the '731 Patent) [Dkt. No. 212-10].  I previously addressed this limitation in the IC Order, noting that "Finjan's theory of infringement as to each specific component of Claim 1b may be hidden somewhere in those screenshots and sets of source code, but it is not readily apparent it its current state."  IC Order 10-

United States District Court
Northern District of California

11.

During the AIC round, Check Point argued that Finjan's contention for the Network IPS blade for this limitation was three pages long, two of which contained screenshots and text parroting the language of the limitation. MTS SAIC 20. It argued that the third page contained a single source code citation but with no explanation. *Id.* Check Point highlighted this deficiency in its letter to Finjan but claims that Finjan did not address this issue in its SAICs. *Id.*

As Check Point highlights, the first two pages are identical as the prior contentions aside from rephrasing "IPS technology in Check Point Blade Architecture" to "IPS instrumentality," and the third page contains the same bare bones explanation. MTS SAIC 20. It argues that Finjan continues to take the position that this citation "shows the presence of a scanner" without identifying what the scanner is, let alone whether and how it is used to scan incoming files from the Internet. *Id.* Finjan also does not explain how the IPS blade derives "security profiles" from incoming files much less that any such security profiles include a list computer commands that the incoming files are programmed to perform. *Id.* at 21.

Finjan responds that it did explain limitation 1b. Oppo. 22; *see* Kobialka Decl., Ex. 80 at 5 (copy of "Appendix D - Network IPS" chart for the '731 Patent) [Dkt. No. 223-17]; Mitz. Decl. ¶ 26.[7] Its explanation is that the entirety of limitation 1b is supported by a single cite, and that cite only shows the results of some analysis associated with deriving security profiles. The cited code does not show scanning files or deriving security profiles. What is the scanner? What is the security profile? Where is it derived? How does it comprise a list of computer commands? Finjan does not say.

This is not the first time that this example has come up. In the IC order, I explained that "Finjan would be required to identify what source code is . . . 'generating reports or security profiles' in alleging infringing Network Security Products." IC Order at 10. Finjan has failed to

---

[7] Finjan also argues that this is similar to Check Point's previous arguments about Doctrine of Equivalents ("DOE") analysis in the AICs was deficient, which I rejected because it was not raised previously in connection with Finjan's ICs. Oppo. 20. Check Point's argument about a lack of explanation of cited source code is not a new argument; it is something that has been addressed in each of my previous orders.

United States District Court
Northern District of California

do that again.  Because Finjan has failed to explain how limitation 1b is found within Network, its contentions against Network IPS infringing Claim 1 of the '731 Patent are struck with prejudice.

### b. <u>Example at Hearing</u>: Endpoint Threat Emulation Chart for Claim 17 of the '731 Patent

At the hearing, Finjan provided its Endpoint Threat Emulation chart for the '731 Patent as its strongest contentions under this issue.  *See* Kobialka Decl., Ex. 73 (copy of "Appendix D - Endpoint Threat Emulation" chart for the '731 Patent) [Dkt. No. 223-15].  It pointed to its source code citations on pages 4 and 8 as examples of how it has sufficiently explained source code citations for limitations 17b and 17d.  *Id.*, Ex. 73 at 4, 8.  Check Point only challenged Finjan's explanation for limitation 17d on page 8, not limitation 17b on page 4.  *See* Appendix A at 38 [Dkt. No. 212-5].

Limitation 17d of the '731 Patent requires "deriving a security profile for the retrieved file, the security profile including a list of at least one computer command that the retrieved file is programmed to perform."  Kobialka Decl., Ex. 73 at 8.  Finjan pointed to its source code explanation in the second to last paragraph, but Check Point argued that this only showed aspects "associated with security profile data."  *Id.*  It asserted that this explanation was inadequate because it only informs Check Point of some functions that create reports, which are then associated with security profile data; it does not explain what the security profile is itself.[8]

Inadequate explanation of the "security profile" seems to be a common theme among the contentions pointed out by Check Point.  Similar to limitation 1b of the '731 Patent discussed in the briefing, Finjan fails to explain what the security profile is.  What allegedly creates the security profile?  Where does the security profile allegedly reside?  What are the things in the security profile that allegedly constitute the list of computer demands?  Finjan does not say.   Finjan has failed to explain how limitation 17d is found within Endpoint Threat Emulation; its contentions against Endpoint Threat Emulation infringing Claim 17 of the '731 Patent are struck with prejudice.

---

[8] Check Point also asserted that the source code citations in the last paragraph are not from the Endpoint Threat Emulation product, which is something Finjan should have known by looking at Rog. 9.

1

c.      **Example at Hearing**: Network Anti-Virus Chart for Claim 1 of the '844 Patent

2      Finjan also provided its chart for Network Anti-Virus chart for the '844 Patent as one of its

3  strongest contentions.  *See* Kobialka Decl., Ex. 115 (copy of "Appendix F - Network Anti-Virus"

4  chart for the '844 Patent) [Dkt. No. 223-19].  The parties dispute whether the source code cited on

5  pages 7 and 8 belong to the Network Anti-Virus instrumentality.  Assuming that it does, Finjan

6  fails to provide an adequate explanation of the downloadable security profile.

7      Limitation 1c of the '844 Patent requires "generating by the inspector a first Downloadable

8  security profile that identifies suspicious code in the received Downloadable[.]"  Kobialka Decl.,

9  Ex. 115 at 7.  Finjan argues that it is not required to identify code that is the security profile itself,

10  but rather code that takes actions to *generate* the security profile.  Even so, the explanations on

11  pages 7 and 8 do not make clear what code generates the downloadable security profile.

12      As argued by Check Point, the second source code citation paragraph on page 7 only

13  explains an aspect that derives security profile data but does not explain what the policy is that

14  identifies suspicious code within that data set.  *Id.*  In the next paragraph, Finjan only discusses

15  reports that are "associated" with security profile data, but does not explain what generates the

16  security profile is itself.  *Id.*  In the next paragraph, Finjan only explains a policy "which can be

17  used to generate [downloadable security profile] data," but does not explain what the

18  downloadable security profile is generated by.  *Id.*  Check Point argues that the same problem

19  continues on page 8 as well.  *See id.* at 8.

20      Because Finjan fails to explain how limitation 1c is found within Network Anti-Virus, I

21  strike with prejudice its contentions against Network Anti-Virus infringing Claim 1 of the '844

22  Patent.  I also strike with prejudice all other instances where Finjan fails to provide adequate

23  source code explanations.  The master will identify the contentions that should be struck for this

24  reason.

25      2.      **Issue 6(b)**: The SAICs repeat the same source code for disparate limitations without explanation as to why it applies.

26

27      a.      **Example in Briefing**: Network IPS Chart for Claim 10 of the '494 Patent and Claim 1 of the '731 Patent

28      Check Point argues that Finjan continues to cite the same source code for different

United States District Court
Northern District of California

1    limitations, different patents, and different products without explaining why the same source code

2    applies in these different cases.  MTS SAIC 21.  I expressly ordered Finjan to provide such

3    explanation in my last AIC Order.  *See* AIC Order at 11 ("Where Finjan has used the same source

4    code for different things, it may amend its infringement contentions to better explain why the

5    same source code [] applies to wholly different limitations.").  It has failed to do so.

6           For example, Check Point argues that Finjan uses the following two source code citations

7    across 4 different limitations (in 3 different patents) and across 5 different products (and the

8    combination of these 5 products with additional products).  MTS SAIC 22 (listing two source code

9    cites); *see* Caridis Decl., Ex. U at 11 (copy of "Appendix D - Network IPS" chart for the '731

10   Patent) [Dkt. No. 212-10].  In particular, for limitations 1d and 14f of the '731 Patent it argues that

11   Finjan only attempts to link these two cites with the claim language by conclusively stating that

12   the accused product "receives data from the cloud," and that this supposedly "supports that the

13   accused instrumentality has a security profile cache to store the threat data feeds."  MTS SAIC 22.

14   Finjan does not explain how or why "cloud data" is "associated with security profile data" or what

15   it would mean for these two sets of data to be "associated."  *Id.*  This problem is made worse by

16   the fact that the same code and similarly opaque explanations are cited in nearly 20 charts, and that

17   Finjan uses the same citation and nearly-identical descriptions for very different claim limitations.

18   *Id.* at 22-23.

19          Check Point contends that Finjan is essentially using the same two source code citations,

20   with effectively the same explanation, to demonstrate both *storing* ('494, '731) and *retrieving*

21   ('086), to demonstrate the existence of both a *database manager* ('494, '086) and a *cache* ('731),

22   and to show indexing according to an ID or identifier of an *incoming downloadable* ('086), a

23   *stored file* ('731 1d), and a *retrieved file* ('731 14f).  MTS SAIC 23.  Check Point gave Finjan the

24   code for all its products in Interrogatory No. 9, yet it points out that Finjan still cites the same code

25   across very different products.  *Id.* at 24.

26          Finjan responds that although there might be some overlapping pincites shared between

27   claim elements, this only looks at a portion of the source code that is cited and ignores that each

28   element includes an additional distinct set of pincites beyond what overlaps, even if some files are

35

shared.  Oppo. 23.  It argues that it explains the extent to which there is some overlap in shared code.  *Id.*  It further contends that similar functionalities are involved for some claim elements, which explains why pincites overlap across these elements.  *Id.* at 24.  It goes on to argue that Check Point's invalidity contentions show how Check Point also fails to explain why similar source code is cited for different things.  *Id.* at 24-25.

Check Point's invalidity contentions are not the subject of this pending motion; whether Finjan's SAIC have complied with my previous three orders is.  Moreover, Finjan's response that it has always cited additional code files beyond what overlaps is false, at least for the example pointed out by Check Point.  As Check Point identifies, the IPS charts for '494 Patent limitation 10d and '731 Patent limitation 1d cite the same 4 files—two listed in the motion and two more files with largely the same explanation.  *Compare* Kobialka Decl., Ex. 10 at 12 [Dkt. No. 223-11] (copy of "Appendix A - Network IPS" chart for the '494 Patent); *Id.*, Ex. 80 at 11 [Dkt. No. 223-17] (copy of "Appendix D - Network IPS" chart for the '731 Patent).  Neither explain how the same source code shows infringement for a database manager ('494 Patent limitation 10d), and a security profile cache ('731 Patent limitation 1d).  The few words that are different among the two explanations parrot the claim language.  Accordingly, I strike with prejudice Network IPS infringing Claim 10 of the '494 Patent and Claim 1 of the '731 Patent.

### b.   Example at Hearing: Network Anti-Virus Chart for Claims 1 and 15 of the '844 Chart

At the hearing, Finjan provided its Network Anti-Virus chart for the '844 Patent as its strongest contentions related to this issue.  *See* Kobialka Decl., Ex. 115 (copy of "Appendix F - Network Anti-Virus chart for the '844 Patent) [Dkt. No. 223-19].  It pointed to pages 4 and 7 of this chart to show that limitation 1b and 1c had overlapping source code cites, but the explanations for each are different and tailored to the limitations.  Check Point did not challenge Finjan's explanation of limitation 1b.  *See* Appendix A at 49-50 [Dkt. No. 212-5].

Check Point highlights how Finjan's explanation of limitation 1c is identical to its explanation for a completely different limitation, 15b, in the same chart.  Limitation 1c of the '844 Patent is about "generating by the inspector a first Downloadable security profile that identifies

suspicious code in the received Downloadable," whereas limitation 15b is about "memory storing a first rule set." Kobialka Decl., Ex. 115 at 7, 16. Despite the clearly different limitations at play, Finjan's source code citations and explanations of both are identical, with minor changes to a few words in the introductory paragraphs. *See id.* at 7-8, 16-17.

Finjan did not adequately respond to this argument at the hearing, simply noting that its experts claim that the "rule set" in limitation 15b has a role to play in the "security profile" in limitation 1c. Even if this purported explanation was adequate, it is not made clear in the charts such that it could put Check Point on notice of Finjan's infringement theory regarding these two different limitations. This chart was selected by Finjan as one of its strongest, but a comparison between limitation 1c and 15b is indicative of its failure to explain why the same source code applies to different limitations. I strike with prejudice Finjan's contentions against Network Anti-Virus for Claims 1 and 15 of the '844 Patent.

I also strike with prejudice all other instances where Finjan cites the same source code for different limitations, different patents, and different products without explaining why the same source code applies in these different cases. The master will identify the contentions that should be struck for this reason.

## II.   MOTIONS TO SEAL

The parties file 6 administrative motions to file under seal in conjunction with the above motions. [Dkt. Nos. 212, 223, 229, 231, 234, 241].

On October 18, 2019, Check Point moved to seal portions of its MTS SAIC and a number of attachments to its MTS SAIC reflecting and related to "highly-confidential, commercially-sensitive, and proprietary trade secret source code, and the operation of the products that are comprised of such source code, neither of which is publicly-known and would cause Check Point significant competitive harm should it be made public." [Dkt. No. 212]. It also states that "given the nature of the products at issue (network and computer security products), disclosure of the information sought to be sealed could compromise the security of computers and networks protected by such products." *Id.* Check Point filed a similar motion related to its MTS SAIC Reply. [Dkt. No. 234]. Finjan also moved to seal portions of its Opposition to the MTS SAIC and

1    a number of attachments to its Opposition.  [Dkt. No. 223].  Check Point submitted a declaration

2    explaining why the material is sealable.  [Dkt. No. 228].  Finjan filed renewed motions to seal

3    portions of its Corrected Opposition and a number of attachments to its Corrected Opposition.

4    [Dkt. Nos. 229, 231].  Check Point again submitted a declaration explaining why the material in is

5    sealable.  [Dkt. Nos. 239, 240].

6         Records attached to non-dispositive motions are not subject to the strong presumption of

7    access.  *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179-80 (9th Cir. 2006).

8    Because the documents attached to non-dispositive motions "are often unrelated, or only

9    tangentially related, to the underlying cause of action," parties moving to seal must meet the lower

10   "good cause" standard of the Federal Rules of Civil Procedure Rule 26(c).  *Id.* (internal quotation

11   marks omitted).  The "good cause" standard requires a "particularized showing" that "specific

12   prejudice or harm will result" if the information is disclosed.  *Phillips ex rel. Estates of Byrd v.*

13   *Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) (internal quotation marks omitted);

14   see Fed. R. Civ. P. 26(c).  "Broad allegations of harm, unsubstantiated by specific examples of

15   articulated reasoning" will not suffice.  *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476

16   (9th Cir. 1992).

17        I find that the parties have shown good cause to file the requested documents under seal

18   and have narrowly tailored their requests to confidential information.  [Dkt Nos. 212, 223, 229,

19   231, 234].

20        However, I will not accept manual filings of Exhibits 1 and 2 to Declaration of Kristopher

21   Kastens, which are paper copies of documents designated as source code produced in this

22   litigation in Rog. 9.  [Dkt. No. 241].  Finjan argues that because Section 9(e) of the Protective

23   Order, Dkt. No. 31, prohibits the parties from creating any electronic copies of source code

24   designated materials, it was unable to e-file these documents.  *Id.*  In its declaration explaining

25   why the material is sealable, Check Point also points to Section 9(e) of the Protective Order.  [Dkt.

26   No. 243].  But in order to have a complete record of this case, these exhibits need to be properly

27   filed with the court.  E-filing documents under seal with the court's electronic filing system will

28   keep the documents protected.  Check Point is HEREBY ORDERED to properly e-file under seal

United States District Court
Northern District of California

38

United States District Court
Northern District of California

1   Exhibits 1 and 2 to the Declaration of Kristopher Kastens.

2       I have quoted portions of the sealed exhibits in this order that I do not think reveal

3   protected information.  Any party that disagrees may file a declaration detailing any additional

4   portions of this order that should be redacted and explaining why such redactions are necessary.  If

5   no declaration is filed within 5 days of this order, this order shall be posted as is.

6   <center>**CONCLUSION**</center>

7       Check Point's motion to strike the SAICs is GRANTED in part.  Although I previously

8   allowed Finjan to amend its AICs "one last time," I cautioned that "if any of its infringement

9   contentions remain deficient, they may not form the basis for relief in this action."  AIC Order at

10  18.  I now strike with prejudice all contentions identified under Issue 1 (products and theories that

11  were previously struck with prejudice), Issue 2 (new accusations), and Issue 5 (contentions

12  without pinpoint source code citations).  I allow Finjan to include the open-ended citations

13  discussed under Issue 4 because it clarified that these block citations will not be relied on to show

14  infringement at trial, but to provide context and show how pinpoint citations operate.

15      I strike with prejudice all inadequately identified and explained combination contentions

16  discussed under Issue 3.  The master will determine if the other 69 accused combinations should

17  also be struck, as argued by the parties in Appendix C and Rebuttal Appendix C.

18      I strike with prejudice all examples discussed under Issue 6.  The master will determine if

19  other contentions should also be struck for inadequate source code explanations and/or failure to

20  explain why the same source code applies in different cases, as argued by the parties in Appendix

21  A, Rebuttal Appendix A, and Reply Appendix.

22      In order to have a complete record of this case, Check Point is ordered to properly e-file

23  under seal Exhibits 1 and 2 to the Declaration of Kristopher Kastens.

24      **IT IS SO ORDERED.**

25  Dated: January 17, 2020

26

27  

28
    William H. Orrick
    United States District Judge